ALFRED P. CASSELLA, JR. *v.* CIVIL SERVICE COMMISSION OF THE CITY OF NEW BRITAIN (3189)

HULL, SPALLONE and DALY, Js.

Argued April 9—decision released June 25, 1985

*Edward J. Daly, Jr.,* for the appellant (plaintiff).

*Joseph E. Skelly, Jr.,* for the appellee (defendant).

HULL, J. The plaintiff appeals from the judgment of the trial court sustaining the decision of the civil service commission which upheld the decision of the board of fire commissioners to reduce the plaintiff's rank in the fire department from lieutenant to private. We find no error.

The underlying facts are not in dispute. The plaintiff, Alfred P. Cassella, Jr.,[1] began work with the New Britain fire department in 1970. On November 18, 1975, he took promotional examination P-557 after which he was promoted to fire lieutenant on April 25, 1976. By letter dated January 26, 1981, the board notified Cassella, Jr., to attend a hearing to respond to charges that written examination P-557 had been fixed for his benefit by Alfred Pettinelli, then personnel director of the city, and that Cassella, Jr., had thereby violated the city charter and civil service rules. At the hearing before the board on March 23, 1981, documentary evidence, tending very strongly to prove that such a rigged examination had taken place, was admitted over the plaintiff's objection. This evidence may be summarized as follows: (1) guilty plea and a transcript from proceedings in which Alfred P. Cassella, Sr., the plaintiff's father, had pleaded guilty to one count of perjury in violation of General Statutes § 53a-156, which arose from Cassella, Sr.'s denying, before a one-man grand jury investigating New Britain civil service matters, that he gave $1000 in cash to Fire Chief Raymond

---

[1] So styled to distinguish him from his father, Alfred P. Cassella, Sr. The trial court's judgment named the plaintiff as Alfred Cassella.

Galati to pay to Pettinelli for fixing his son's promotion to lieutenant; (2) an affidavit of John Reffner, a chemist and expert witness, stating that at least three and possibly as many as thirteen answers on the answer sheet submitted by Cassella, Jr., for examination P-557 were filled in while the grading master was in place over the answer sheet; (3) Pettinelli's affidavit stating that examination P-557 was fixed for Cassella, Jr., as a personal favor for Raymond Galati and stating that Pettinelli gave Galati blank answer sheets with Cassella, Jr.'s application number written on them and that he later filled in the blank answer sheets and substituted them for the answer sheets filled out at the time of the examination; (4) a transcript of testimony of Pettinelli in *State* v. *Sahadi,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 44810 (October 13, 1982), wherein he admitted fixing examination P-557 to secure Cassella, Jr.'s promotion to fire lieutenant.

None of the declarants appeared before the board. Pettinelli and Reffner had been barred by a Superior Court "gag order" from testifying. The record is uncertain as to whether Cassella, Sr., was present. His attorney at the hearing, likewise his attorney before this court, stated to this court that Cassella, Sr., had informed him that if called he would plead the fifth amendment. There was no direct evidence of Cassella, Jr.'s involvement in this scheme. He testified unequivocally that he had no knowledge of it. The board found that the examination had been fixed by Pettinelli and that Cassella, Jr., was not a party to it. The board voted to reduce his rank from lieutenant to private, effective March 24, 1981, and to allow him to take a new examination for a lieutenant's post at any time.

Cassella, Jr., appealed his demotion to the civil service commission which sustained the board's decision

on January 5, 1982.[2] He then appealed to the Superior Court which held that he was not denied due process, that the evidence supported his demotion under applicable charter and civil service provisions, and that the notice sent to him concerning the hearing before the board was adequate.

On appeal, Cassella, Jr., claims that the court erred (1) in concluding that the plaintiff was afforded due process at the hearing before the board, and (2) in not concluding that the defendant's finding that the plaintiff violated the city charter and personnel rules is contrary to the evidence and in excess of its authority.

"[A]dministrative tribunals are not strictly bound by the rules of evidence and . . . they may consider evidence which would normally be incompetent in a judicial proceeding, so long as the evidence is reliable and probative." *Lawrence* v. *Kozlowski,* 171 Conn. 705, 710, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles,* 165 Conn. 559, 570, 345 A.2d 520 (1973). "There is, moreover, no specific prohibition against hearsay evidence in the Uniform Administrative Procedure Act (UAPA), which provides that '[a]ny oral or documentary evidence may be received, but [that] the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence.' General Statutes § 4-178 (1)." *Tomlin* v. *Personnel Appeal Board,* 177 Conn. 344, 348, 416 A.2d 1205 (1979). The test of the action of a board of commissioners in a quasi-judicial hearing "is whether the plaintiff had a reasonable opportunity to hear and to be heard upon the charges preferred against him and whether the pro-

---

[2] As the court noted, the defendant civil service commission made no findings of fact and, in effect, simply affirmed the board's findings and procedures. Thus, although we will refer to the commission's findings, any such reference must relate back to the findings of the board.

ceedings were conducted in a fair and impartial manner. *Adam* v. *Connecticut Medical Examining Board,* [137 Conn. 535, 540, 79 A.2d 350 (1951)]." *Conley* v. *Board of Education,* 143 Conn. 488, 493–94, 123 A.2d 747 (1956).

"While proceedings before zoning and planning boards and commissions are informal and are conducted without regard to the strict rules of evidence; *McCrann* v. *Town Plan & Zoning Commission,* 161 Conn. 65, 77, 282 A.2d 900 [1971]; *Parsons* v. *Board of Zoning Appeals,* 140 Conn. 290, 292, 99 A.2d 149 [1953]; nevertheless, they cannot be so conducted as to violate the fundamental rules of natural justice. *Miklus* v. *Zoning Board of Appeals,* 154 Conn. 399, 406, 225 A.2d 637 [1967]. Due process of law requires that the parties involved have an opportunity to know the facts on which the commission is asked to act, to cross-examine witnesses and to offer rebuttal evidence." *Pizzola* v. *Planning & Zoning Commission,* 167 Conn. 202, 207, 355 A.2d 21 (1979); see also *Balkus* v. *Terry Steam Turbine Co.,* 167 Conn. 170, 177, 355 A.2d 277 (1974).

Nevertheless, the leading case of *Richardson* v. *Perales,* 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), sanctioned written reports from four physicians not present at a social security disability hearing, as sufficiently trustworthy substantive evidence to afford due process to the claimant. The court held that such a written report, despite its hearsay character and absence of cross-examination, may constitute substantial evidence supportive of a hearing examiner's finding adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician. Id., 402; see also *Altholtz* v. *Dental Commission,* 4 Conn. App. 307, 312, 493 A.2d 917 (1985). Although the clear trend of federal cases since *Richardson* v. *Perales,* supra, is toward the admission

of hearsay evidence as substantial evidence if suffi-
ciently trustworthy, the cases are far from uniform in
their handling of this issue. See 3 Davis, Administra-
tive Law (2d Ed) § 16.8.

In *Carlson* v. *Kozlowski,* 172 Conn. 263, 374 A.2d 207
(1977), the court stated that written evidence which was
the only evidence probative of the plaintiff's culpabil-
ity was not substantial evidence under the UAPA to
support the commissioner's finding "absent a showing,
which has not been made here, that the appellant knew
it would be used and failed to ask the commissioner to
subpoena the declarants." Id., 267. The *Carlson* court
identified certain factors in *Richardson* v. *Perales,*
supra, "which assured the underlying reliability and
probative value of the hearsay evidence." *Carlson* v.
*Kozlowski,* supra. "Among the factors which were con-
sidered as establishing trustworthiness were: the doc-
tors had no bias or interest in the case; the reports
'were based on personal consultation and personal
examination and rested on accepted medical procedures'
. . . there was no inconsistency on the face of the
reports; and written medical reports by treating physi-
cians have long been recognized by the courts as having
inherent reliability and probative worth." Id., 267–68.

The trial court aptly cited four pertinent *Richardson*
factors by which it weighed the due process question
involved here: (1) the availability of the witness declar-
ant; (2) the lack of bias or interest on the part of the
witness declarant; (3) the quality and probative value
of the out of court statements; and (4) the nature and
atmosphere of the proceeding.

The court painstakingly reviewed the hearsay evi-
dence in light of the *Richardson* factors.

I

We must first consider the question of availability
of the declarants. We have earlier noted that both

*Richardson* and *Carlson* rest partially on the fact that the plaintiff did not use subpoena procedures available to him to secure the attendance of the nonappearing declarants. Such a reliance on this factor, however, falls far short of a holding that, where the declarants are unavailable, due process cannot be met if hearsay statements are admitted. It is noteworthy that Professor Davis, in his treatise, does not deal with this issue head-on. In discussing *Blackwell College of Business* v. *Attorney General,* 454 F.2d 928 (D.C. Cir. 1971), a case involving the admission of affidavits by former students of the college, Professor Davis refers to the following language in that opinion: " '[I]f [the college] denies the truth of the evidence, *[it] shall have opportunity, if it so desires, to confront and cross-examine* the person or persons who supplied the evidence, unless the particular hearsay evidence is appropriate for consideration under some accepted exception to the hearsay rule.' " (Emphasis added.) Davis, Administrative Law § 16.8, p. 252. Of this language, Professor Davis asked: "Was the court's guide a little too strict? If some of the students were unavailable, should their affidavits be excluded from consideration along with the other evidence?" Davis, Administrative Law, supra.

Professor Davis comments further, on the precise question involved in this case as follows: "A question which federal law still does not clearly answer is this: If the authors of the written reports had been unavailable, would the reports be substantial evidence? The three dissenters [in *Richardson* v. *Perales*] clearly would say no—they seemed to pass upon that question and they did say no. Although two more Justices might join them, the majority opinion in the Perales case seems amply to support the decision even apart from the lack of request for subpenas [sic]. The decision on the modified facts might still be six to three.

"What should it be? Views obviously differ, but here is one opinion . . . . No rule should exist that evidence inadmissible in a jury case may not be substantial. Substantiality of evidence should be determined by appraising it in its full context. . . . *Lack of opportunity for cross-examination should be given much weight but should not be conclusive.* The agency as the finder of facts may sometimes regard cross-examination or lack of it as decisive on the question whether or not a finding should be based on a written report, but that determination has to be made in each case, not by blanket rule. The test on judicial review is whether the finding is reasonable in the light of the whole record, and that is a matter for judgment in each case, not for a rule based on what evidence is admissible in a jury case." (Emphasis added.) Davis, supra, § 16.7. Numerous factors present in this case tip the scales in favor of a holding that the plaintiff was not denied due process at the hearing: (1) *The fact that the plaintiff did not subpoena Cassella, Sr., whose plea of guilty was such cogently trustworthy evidence of the fixing scheme.* As a result, it cannot now be known what position he would have taken if this had occurred, and what ruling the commission would have made as to the validity of any fifth amendment claim he might have made. Thus, it cannot be said that Cassella, Sr., was unavailable. (2) *The extent of the defendant's effort to make Pettinelli and Reffner available.* The record indicates that the city of New Britain sought to have Pettinelli and Reffner released from the "gag order" imposed by the grand jury, but the Superior Court, on January 28, 1981, specifically ruled that they "ARE NOT released from the order of secrecy for the purpose of allowing their testimony at administrative disciplinary proceedings in the City of New Britain." (3) *The need for the admissiblity of the hearsay evidence because of the unavailability of the declarants.* We would

be blind to reality if we did not recognize the difficulty of proving a case arising out of a widespread municipal corruption case. Pettinelli was the key actor in this sorry drama. His testimony was not only highly probative but was essential in this disciplinary proceeding. Reffner's scientific testimony nailed down the maestro's testimony and compelling testimony of the plaintiff's father completed the evidentiary web.

## II

Concerning the interest or bias of the declarants, the court admitted doubt about the questionable nature of Pettinelli's motives. But the court found a "reassuring dose of credibility" in the corroborating statements of Cassella, Sr., and Reffner. It also considered Reffner's statement to be significant because it was that of an unbiased professional with no interest in the outcome of the proceedings. The plaintiff argues that as the alleged mastermind of fixing in New Britain, Pettinelli had an interest in the evidence he gave in his affidavit in order to seek leniency in his own sentence. We conclude that the court properly gave weight to this consideration in concluding that the three statements were highly probative.

## III

The linchpin of the due process evaluation we undertake is the trustworthiness of the hearsay evidence. "[T]he reliability of hearsay ranges from the least to the most reliable. The reliability of non-hearsay also ranges from the least to the most reliable. Therefore the guide should be a judgment about the reliability of particular evidence in a particular record in particular circumstances, not the technical hearsay rule with all its complex exceptions." Davis, "Hearsay in Administrative Hearings," 132 Geo. Wash. L. Rev. 689 (1964). Cases on the inadmissibility of hearsay evidence in court, although not directly in point, are highly relevant. The supreme court recently summed up the rule

concerning admissibility of evidence not admissible under some recognized exception to the hearsay rule as follows: " '[H]earsay may be admitted if there is a sufficient probability that the statement is reliable and trustworthy, if the evidence contained in the statement is necessary to resolution of the case, and if the trial court concludes that admitting the statement is in the interests of justice. 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1422, pp. 253–54. Some types of admissible hearsay occur frequently enough that certain defined exceptions to the general rule of inadmissibility have come to be recognized.' *State* v. *Stepney,* 191 Conn. 233, 249–50, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). The unique factual situation presented in this case does not fall neatly into one of the traditional exceptions to the hearsay rule. Therefore, our analysis must focus on (1) whether there was a reasonable necessity for the admission of the statement, and (2) whether the statement was supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions. See *State* v. *Acquin,* 187 Conn. 647, 680, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); *State* v. *Reardon,* 172 Conn. 593, 598, 376 A.2d 65 (1977); Tait & LaPlante, Handbook of Connecticut Evidence § 11.25 (1984 Sup.); see also Fed. R. Evid., rules 803 (24), 804 (b) (5)." *State* v. *Sharpe,* 195 Conn. 651, 664–65, 491 A.2d 345 (1985); cf. *State* v. *DeFreitas,* 179 Conn. 431, 426 A.2d 799 (1980) (admissibility, as exception to hearsay rule, of statements against penal interest exculpatory to the defendant); *State* v. *Gold,* 180 Conn. 619, 431 A.2d 519, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980) (rule allowing statements against interest in the nature of third party confessions expanded to allow for admission of other statements against interest), in which the declarants were unavailable to be called as witnesses.

Concerning the inherent quality and probative value of the hearsay statements, the court noted that they were made by three persons: Pettinelli, Reffner, and Cassella, Sr.; that Pettinelli's affidavit is "most definite" and recounts, in detail, both the identity of the go-between and the method used to alter the examination results; that these details are substantially corroborated by statements of the plaintiff's father and Reffner; and that these factors in combination give a high degree of probative value to the statement.

We can only add, concerning the quality and probative value of this statement, that the second and third *Richardson* factors cited in *Carlson* relate to this subject and were fully satisfied in this case. The affidavits were obviously based on the personal activities, knowledge, and observations of all three declarants. Concerning inconsistency on the face of the reports, the only one apparent is that Pettinelli's affidavit says that the examination was fixed as a favor to Raymond Galati while the statement of facts by the state's attorney, not denied by Cassella, Sr., when he pleaded guilty to perjury, claimed that Cassella, Sr., paid $1000 to Pettinelli through Galati for the examination fixing. This inconsistency does little to shake the probative value of the statements, all of which dovetail together like an evidential jigsaw puzzle supportive of the existence of the fixing scheme.

## IV

Concerning the atmosphere at the hearing, the plaintiff claims strongly that it was adversary and hostile. An examination of the transcript of the hearing does not support this claim. The court points out that the plaintiff was exonerated of any fraud or wrongdoing. The board ordered his demotion from a promotion based on an invalid examination. The court found that the board adopted "a more adjudicative, as opposed to

an adversarial role." We can only add to this conclusion the fact that the board, in an apparently conciliatory gesture, notified the plaintiff that he could take the promotion examination again at any time. We cannot say, on this record, that the court did not fairly evaluate this prong of the *Richardson* criteria.

The plaintiff relies on two cases to vitiate the effect of *Richardson* v. *Perales,* supra. The first is *Greene* v. *McElroy,* 360 U.S. 474, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959), which involved the revocation of the petitioner's security clearance as a result of which he lost his job in aeronautical engineering involving defense-related work. The evidence against him at the hearing concerned association with communists. No witnesses were presented against him. The government relied on confidential reports never made available to him. Of necessity, the Supreme Court held that the denial of Greene's right of confrontation and concommitant right of cross-examination failed to comport with traditional ideas of fair procedure so that the administrative hearings failed to meet due process standards. That this case involving confidential sources is light years away from the plaintiff's situation requires no further discussion.

The plaintiff argues that the case of *Goldberg* v. *Kelly,* 397 U.S. 254, 262–63, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), supports his position. In *Goldberg,* the Supreme Court held that a welfare recipient must have an opportunity for an evidentiary hearing before he could be terminated from welfare. In so holding, the court held that "due process requires an opportunity to confront and cross-examine adverse witnesses." Id., 269. We do not consider *Goldberg* controlling in this case. It had to do with termination of AFDC benefits without prior notice. The plaintiff here was reduced in rank but was not terminated from the position he lawfully held. He

had adequate notice.[3] "These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett* v. *Kennedy,* [416 U.S. 134, 167–168, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974)] (Powell, J., concurring in part); *Goldberg* v. *Kelly, supra,* at 263–266; *Cafeteria Workers* v. *McElroy, supra,* at 895. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e.g., Goldberg* v. *Kelly, supra,* at 263–271." *Mathews* v. *Eldridge,* 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

---

[3] *Richardson* v. *Perales,* 402 U.S. 389, 407, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), distinguished *Goldberg* v. *Kelly,* 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), on similar grounds. It also distinguished that case on the ground that credibility and veracity were at issue as they must be in many termination proceedings. This was not the case in *Richardson* v. *Perales,* supra. The distinction is not entirely valid in the present case. Credibility was a minor factor in Reffner's testimony and was minimal in Cassella, Sr.'s testimony, but it certainly was a major factor in Pettinelli's testimony.

Although *Mathews* v. *Eldridge,* supra, involved the need for a hearing before an initial determination of termination of social security disability benefits, the standards it enunciates are controlling in any due process case. We consider the three *Mathews* criteria as follows: (1) The private interest which will be affected by the official action is substantial and entitled to due process protection. This is not disputed in this case. (2) The risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. In view of the ineluctable nature of the documentary evidence, we find the risk of erroneous deprivation of Cassella, Jr.'s interest to be minimal. Since the defendant could not get the gag order on Pettinelli and Reffner lifted, we can find no additional or substitute procedural safeguards that should have been employed. (3) The government's interest, including the function involved. The interest of the city of New Britain in ridding its fire department of an officer whose promotion had been bought is self-evident.

In the final analysis, due process must be evaluated in context. We take judicial notice of the far-reaching fixing scandals that convulsed New Britain through several years of grand jury investigation and criminal charges arising from it. We recognize the disgrace and broken lives that followed. A highly charged atmosphere prevailed. The need to restore integrity in the civil service was paramount. The city was not able to present Pettinelli and Reffner in person. Under all of the circumstances, the board and all concerned with the action taken against the plaintiff conducted themselves in an evenhanded and reasonable manner. The plaintiff was afforded a fair and impartial hearing and was not deprived of due process of law by the written hearsay evidence admitted by the board.

The plaintiff's second issue is that the board's finding that Cassella, Jr., violated the city charter and personnel rules, is contrary to the evidence and in excess of its authority. He points out that he was charged before the board with violation of Section 411[4] of the charter which sets forth practices prohibited in connection with civil service examinations and with violations of Rule XIII[5] of the rules of the civil service commis-

---

[4] Section 411 of the New Britain Charter provides: "No person shall deceive or obstruct any applicant in respect to his or her right of test under the provisions of this chapter or falsely make, grade, or estimate or report upon the test or standing of any person tested hereunder, or aid in so doing, or furnish to any person, except in answer to inquiries of the commission, any special information for the purpose of either improving or injuring the rating of any such applicant for appointment, employment, or promotion. No applicant shall deceive the board for the purpose of improving his chances or prospect for appointment or promotion. No person shall solicit, orally or by letter, and no applicant or employee shall receive or solicit or be in any manner concerned in the receiving or soliciting of, any money or valuable thing from any official or any employee holding a position in the classified service for any political party or purpose. No person shall use or promise to use his influence or official authority to secure any appointment or promotion or prospect of appointment or promotion to any position classified under this chapter. No official or employee shall, by means of threats or coercion, induce or attempt to induce any person holding a position in the classified service to resign his position or to take a leave of absence from duty or to waive any of his rights under this chapter. A resignation executed previous to appointment shall be of no effect."

[5] Rule XIII of the Rules of the Civil Service Commission provides, in pertinent part:

"1. An appointing authority shall discharge or suspend without pay pending investigation, any employee in the classified service for any of the following causes:

(1) Prohibited political activity as defined in Section 16 of the Merit Act.

(2) Disloyalty to the United States or membership in any organization declared to be subversive by the United States Department of Justice.

(3) Conviction of a crime involving moral turpitude.

(4) Conduct towards superiors, subordinates, co-workers, prisoners, inmates or the public unbecoming an officer or employee of the City of New Britain.

(5) Two successive efficiency ratings below 60 on a scale of 100 provided the appointing authority has notified the employee in writing immediately following his first rating of less than 60.

(6) Intoxication or unseemly conduct on duty or elsewhere so as to reflect discredit upon the city.

sion. These sections concern employee misconduct. He was accused of his own violations but the board found that he was not involved in the fixing of the examination.

The court concluded that the notice[6] was sufficiently detailed so that Cassella, Jr., was fully apprised, well in advance, of precisely what the board would consider so that he was enabled to prepare his defense. We agree. "The plaintiff was adequately apprised of the issue to be determined or reviewed and [he] had an opportunity to present [his] position . . . ." *Finkenstein* v. *Administrator,* 192 Conn. 104, 112, 470 A.2d 1196 (1984); see also *Hart Twin Volvo Corporation* v. *Commissioner of Motor Vehicles,* 165 Conn. 42, 45, 327 A.2d 588 (1973).

Finally, the plaintiff claims that the charter and rules permit adverse personnel action only in case of misconduct of an employee. The court found that Cassella, Jr. had been demoted for just cause despite the fact that he personally had been found innocent of wrongdoing. We agree with the court's analysis.

---

(7) Wilful neglect or misuse of any city property, equipment, materials or supplies.

(8) Fraud or cullusion [sic] in connection with any examination or appointment in the classified service.

(9) Deliberate violation of any law or rule pertaining to or affecting employment in the city service.

(10) Commission of a criminal or immoral act."

[6] The notice of January 26, 1981 advised Cassella that a hearing would be held to consider the following allegations:

"The written examination, P-557, given on November 18, 1975, for the position of Lieutenant in the Fire Department was fixed for you. Alfred 'S' Pettinelli, then Personnel Director for the City, provided a blank answer sheet to Raymond Galati, then a member of the Fire Department, upon which you placed your examination application number. This answer sheet was returned by Galati to Pettinelli, who substituted it for the answer sheet completed by you at the time of the examination. You received the grade of 75 on the written examination and were appointed a Fire Lieutenant on April 25, 1976."

Section VII of the Commission rules makes a competitive examination a prerequisite to promotion within the department. The great significance of such a provision is made clear in *Ziomek* v. *Bartimole,* 156 Conn. 604, 610, 244 A.2d 380 (1968): "The object of providing for civil service examinations is to secure more efficient employees, promote better government, eliminate as far as practicable the element of partisanship and personal favoritism, protect the employees and the public from the spoils system and secure the appointment to public positions of those whose merit and fitness have been determined by proper examination." Strict compliance with the law concerning examination requirements is necessary. *Resnick* v. *Civil Service Commission,* 156 Conn. 28, 32, 238 A.2d 391 (1968). The board's action was based on the provisions of Section 392 of the Merit Act provisions of the city charter which provides: "No person holding, by final appointment, an office or position classified and graded under the provisions of this act shall be removed, discharged or reduced in rank or pay, except for just cause . . . ." The dishonest examination procedures were clearly just cause to reduce Cassella, Jr., in rank.

The situation would be different if the board sought to dismiss or suspend Cassella, Jr. Such action would require a finding of misconduct by the employee. Rule XIII of the commission provides that the board may "discharge or suspend without pay" an employee who commits any one of certain specified acts. Since no such discharge or suspension was invoked here, this rule of the commission did not come into play.

The charter and rules, when read together to achieve their intended result, make it crystal clear that the initial promotion cried out for reduction in rank to the position Cassella, Jr., originally honestly achieved. To rule otherwise would strike a blow at the integrity of

governmental service under merit system provisions. Neither the law nor common sense requires such a conclusion.

There is no error.

In this opinion the other judges concurred.