# In re Michael M. et al.*
## (10577)

Foti, Landau and Freedman, Js.

Argued June 8—decision released September 15, 1992

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*David B. Rozwaski,* for the appellant (respondent).

*Mary-Anne Ziewacz Mulholland,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (petitioner).

LANDAU, J. This is an appeal by the respondent, Gwendolyn M., from the judgment of the trial court terminating her parental rights with respect to her children, Michael and Mamie M., pursuant to General Statutes (Rev. to 1989) § 17-43a (b) (1), (2) and (4) (now § 17a-112).[1] The trial court found that the allegations in the petitions for termination had been proven by clear and convincing evidence and that it was in the best interest of each child that the parental rights of the respondent be terminated.[2]

On appeal, the respondent claims that: (1) the petitioner did not properly plead abandonment on the ter-

[1] General Statutes (Rev. to 1989) § 17-43a (b) (now § 17a-112) provides in pertinent part: "The superior court upon hearing and notice . . . may grant [a] petition [for termination] if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any nonconsenting parent, over an extended period of time, which . . . shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; or . . . (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."

[2] On October 4, 1990, the trial court granted the department of children and youth service's oral motion to amend the termination petitions to delete all references to the named father. The court found that the father had never legally acknowledged the paternity of the children and that the mother was the sole legal guardian.

mination petitions, and, even if abandonment was pleaded properly, the petitioner failed to provide clear and convincing evidence that she had abandoned her children within the meaning of § 17-43a (b) (1); (2) the trial court improperly determined that she failed to rehabilitate herself within the meaning of § 17-43a (b) (2); and (3) the trial court improperly determined that there was no ongoing parent-child relationship between the respondent and her children within the meaning of § 17-43a (b) (4). We affirm the judgment of the trial court.

The following facts are pertinent to our resolution of this appeal. Michael M. was born on December 25, 1986, and Mamie M. was born on May 30, 1988. Both children resided with the respondent, their biological mother, until the spring of 1989. At that time, the department of children and youth services (DCYS), acting on the confirmation of a number of referrals received from various sources over the preceding five months, filed neglect petitions for both children. On June 15, 1989, both children were found, by default,[3] to have been medically and physically neglected and were committed to the custody of DCYS for an initial period of eighteen months, pursuant to General Statutes § 46b-129.

Initially, both children were placed with the same foster parent, but Michael was removed from the home in September, 1989, because there was insufficient room there to accommodate him. Since being removed, Michael has resided with another foster parent.

During the period of the children's commitment to DCYS, the respondent maintained only sporadic con-

---

[3] An initial hearing was scheduled for April 27, 1989. Although the respondent was notified of the hearing, she failed to appear. The hearing was continued twice and the court, suo motu, appointed counsel to represent her. The respondent failed to attend the commitment hearing, but was represented by counsel at the hearing.

tact with DCYS and her children. She did not regularly telephone her children, she never sent them cards or gifts, and never provided the foster parents with a reliable telephone number to contact her. The respondent visited the children two or three times during the month of August, 1989. She visited both children around Thanksgiving of that same year, spent one day with Mamie and one weekend with Michael in January, 1990, and arranged a visit for Mamie's birthday in May, 1990, but never appeared and did not call to explain her absence until some time later. The respondent had never been denied a requested visit and never stated that transportation problems were reasons for her failure to visit her children regularly.

The respondent contacted DCYS five times from the time the children were committed in June, 1989, until June, 1990, but never provided the children's caseworker with a reliable way to contact her. The respondent's first call to DCYS, in December, 1989, was to schedule an office visit with the children. Although an office visit was arranged, the respondent neither arrived at the scheduled time nor called to explain why she did not attend. She next contacted DCYS in January, 1990, to obtain the children's addresses, which she had misplaced, and then in February, 1990, to find out the date of her February review. Although she was given the date of the review, she failed to attend. She contacted DCYS again in May, 1990, to request assistance in finding a job and an apartment. Her last contact with DCYS was in June, 1990, when she called to inform the caseworker that she had been convicted of assault and was incarcerated at the Connecticut Correctional Institution in Niantic for a period of five years to be suspended after three years, and to request prison visits with her children.

DCYS denied the respondent's request for visitation because of the impending filing of the termination peti-

tions and because of her failure to contact her children for the five months preceding her incarceration. On September 14, 1990, DCYS filed petitions for termination of the respondent's parental rights for both Michael and Mamie, and the trial court ordered psychological evaluations of the respondent, Michael, Mamie and their respective foster parents. On October 4, 1990, the trial court ordered monthly prison visits in Niantic.[4]

David Mantell, the court-appointed psychologist, attempted to evaluate the parties on three occasions and filed three reports with the court. The only party who appeared for the first evaluation was Michael. All of the parties appeared for the second and third evaluations. Mantell found the respondent to be irrational and angry, with a "substantial history of psychosocial adjustment problems, antisocial behavior and a difficult personality . . . substantial history of substance abuse, violent behavior, and arrests." He concluded that her behavior was ultimately self-defeating. He found that her prognosis for rehabilitation was poor given her reluctance to admit that her substance abuse contributed to her children's commitment. Mantell was unable to make a clearer prediction as to the respondent's capacity to rehabilitate herself because of her reluctance to participate in the evaluations. Mantell further found that Mamie's foster mother clearly was her psychological parent, that Mamie had no ongoing relationship with the respondent, that Michael's relationship with his foster mother was stronger than his relationship with the respondent and that he appeared to have multiple psychological parents. On the basis of those findings, Mantell recommended against continued visitation unless there was "a clear-cut plan to reunite

[4] The monthly visits continued until the trial court issued its decision terminating the respondent's parental rights.

the mother and the children along with a high level of probability that this can be accomplished within the reasonably near future."

The respondent was present at the termination hearing, hummed loudly throughout most of the testimony presented by the petitioner and failed to testify on her own behalf. The only evidence she offered was the caseworker's testimony relating to an injury to Mamie's eye the respondent had observed during the last prison visit.[5]

In its memorandum of decision, the trial court found that the petition pertaining to each child alleged that the reasons for the termination of the respondent's parental rights had existed for more than one year, and that the respondent's parental rights should be terminated for three of the four grounds specified in § 17-43a (b), namely: (1) each child had been abandoned by the respondent; (2) in a prior proceeding, each child had been found to have been neglected or uncared for, and that the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, she could assume a responsible position in each child's life; and (3) there was no ongoing parent-child relationship. The respondent appeals from this judgment terminating her parental rights as to her two children, Michael and Mamie.

"Our statutes define the termination of parental rights as 'the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . .' General Statutes § 45-61b (g). It is a most serious and sensitive realm of judicial action. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S.

---

[5] Additional facts will be referred to as they relate to the individual claims.

935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). . . . To justify the termination of parental rights in the absence of consent, one or more of the grounds set forth in General Statutes § 17-43a must be proven by clear and convincing evidence.[6] *In re Juvenile Appeal (84-3),* [1 Conn. App. 463, 467, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)]; see *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 296, 455 A.2d 1313 (1983)." *In re Juvenile Appeal (84-6),* 2 Conn. App. 705, 707–708, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985).

"Section 17-43a carefully sets out . . . four situations that, in the judgment of the legislature, constitute 'countervailing interests' sufficiently powerful to justify the termination of parental rights in the absence of consent. [DCYS], in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing 'best interests' standard vitiates the requirement of compliance with the statutory criteria." (Internal quotation marks omitted.) *In re Luis C.,* 210 Conn. 157, 165, 554 A.2d 722 (1989), quoting *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671–72, 420 A.2d 875 (1979).

---

[6] The standard of "clear and convincing" burden of proof is constitutionally mandated. *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). It refers to a standard of proof that is between the standard required in an ordinary civil action and that required to find criminal guilt. *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 536–37, 368 A.2d 125 (1976). There must be "more than average certainty on the part of the fact finder." *Santosky* v. *Kramer,* supra, 758; *In re Juvenile Appeal (83-CD),* 189 Conn 276, 297, 455 A.2d 1313 (1983); *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 468, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).

## I

The respondent first mounts a two-part challenge to the trial court's finding that she abandoned her two children. The respondent initially claims that the petitioner did not properly plead abandonment in the petition for termination. In the alternative, she claims that, even if the petitioner did properly plead abandonment, the petitioner failed to provide clear and convincing evidence that she had abandoned her children. We disagree with both claims.

## A

The first portion of the respondent's claim is that abandonment was not properly pleaded because the paragraph on the face of the two petitions for termination alleging abandonment did not have a check in the box next to "mother," and consequently the trial court lacked subject matter jurisdiction to consider the allegation.[7] It is axiomatic that DCYS, in petitioning to terminate parental rights on the basis of abandonment, in the absence of consent, must allege and prove abandonment as set forth in § 17-43a (b) (1). The statutory criteria must be strictly complied with before termination can be accomplished. *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 13, 438 A.2d 801 (1981); *In re Juvenile Appeal (Anonymous)*, supra, 671.

The respondent notes correctly that a fundamental aspect of due process requires that a party be fully apprised of the allegations that he or she is facing and that strict adherence to the criteria of § 17-43a furthers this goal. We are also cognizant, however, of the presumption in favor of upholding a trial court's ruling; *State* v. *Jones*, 205 Conn. 638, 660, 534 A.2d 1199

---

[7] The question of subject matter jurisdiction may be raised at any time in the proceedings. *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 363, 488 A.2d 790 (1985).

(1987); and the nonbinding effect of clerical defects where notice has otherwise been effectively given. *Cassella* v. *Civil Service Commission,* 4 Conn. App. 359, 370–71, 494 A.2d 909 (1985), aff'd, 202 Conn. 28, 519 A.2d 67 (1987).[8]

Although the petitioner failed to check the appropriate box on the face of the petition, the accompanying document, entitled "Summary of Facts Substantiating the Termination Petition," clearly alleged abandonment as to the mother, as did other portions of the petition itself. The summary of facts stated that "[t]he children have been abandoned by their mother Gwendolyn [M]. Since commitment on 6/15/89, mother has had minimal contact with her children or with DCYS regarding a plan for the children's future." Moreover, a review of the petition itself supports the conclusion that the respondent was on notice of the abandonment allegations against her. In the portion of each of the petitions where the petitioner is provided with the opportunity to allege specific misconduct in support of the allegations, the petitioner indicated that "Mother has had minimal contact with her child." We conclude that the trial court properly found that the respondent was notified of the allegations of abandonment.

## B

The second portion of this claim is that the petitioner failed to provide clear and convincing evidence that the respondent had abandoned her children.[9] This claim

---

[8] " 'Due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

[9] We recognize that incarceration of a parent, alone, does not constitute abandonment or cause for termination of that parent's rights. *In re Juve-*

necessarily involves a challenge to the trial court's findings of fact and their application to its definition of abandonment. *In re Rayna M.,* 13 Conn. App. 23, 36, 534 A.2d 897 (1987). We cannot retry the facts. *In re Noel M.,* 23 Conn. App. 410, 418, 580 A.2d 996 (1990). On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. *In re Juvenile Appeal (84-3),* supra, 478, citing *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

Abandonment focuses on the parent's conduct. *In re Rayna M.,* supra. It is not the lack of interest alone that is the criterion in determining abandonment. Id., 37. Under General Statutes § 17-43a (b), abandonment is defined as the failure to maintain interest, concern or responsibility as to the welfare of the child. " 'Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility" for the welfare of a child. *In re Luke G.,* 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985). Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. *In re Juvenile Appeal (Docket No. 9489),* [supra].' . . . [Section] 17-43a (b) (1) does not contemplate a sporadic showing of the indicia of 'interest, concern or responsibility for the welfare of a child.' A parent must maintain a reasonable degree of interest in the welfare of his or her child. ' "Maintain" implies a continuing, reasonable degree of concern.' " *In re Rayna M.,* supra, 37–38; *In re Migdalia M.,* 6 Conn. App. 194, 208–209, 210, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

*nile Appeal (Docket No. 10155),* 187 Conn. 431, 443, 446 A.2d 808 (1982); *In re Juvenile Appeal (84-6),* 2 Conn. App. 705, 711, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985).

The trial court found that (1) although prison visits had been denied by DCYS during the three months preceding the filing of these petitions, the absence of contact between the two children and their mother was not ascribable solely to this three month hiatus, (2) from the time of their commitment in June, 1989, until the time the respondent requested prison visits a year later, her contact with the children had been irregular and sporadic, (3) the respondent stopped seeing both children in January, 1990, and made no effort to contact either of them for the next five months, and (4) even before January of 1990, her conduct failed to demonstrate the "reasonable degree of interest, concern or responsibility" that would preclude the finding of abandonment under the statutory definition.

Those findings are amply supported by the record. In making those findings, the trial court relied on the testimony of Mamie's foster mother and the children's DCYS caseworker. The caseworker testified that she was assigned to Michael and Mamie's case in October, 1989, that the respondent contacted her shortly thereafter to arrange an office visit with the children, but that she never appeared for the scheduled visit. She did not provide her with a home telephone number or call to explain her absence. When the respondent contacted her again in December to request the children's addresses and telephone numbers, which she had lost, the caseworker informed the respondent that she could arrange for visits directly with the foster parents. She further testified that from the time the respondent had a one day visit with Mamie and one weekend visit with Michael, both in early January, 1990, the respondent did not see, speak with or arrange for a visit with the children until the end of May, 1990. Mamie's foster mother testified that the respondent visited two or three times during July and August of 1989, once around Thanksgiving of 1989 and once in January,

1990. She also testified that the respondent did not contact her again until May, 1990, when she called to arrange a visit for Mamie's birthday, but that she failed to appear or telephone to explain why she did not show up. During the intervening months the respondent rarely telephoned her children, never sent cards or attempted to keep in regular contact with them in any way.

Accordingly, we conclude that the trial court, following the mandates of General Statutes § 17-43a (b) (1), properly determined, on the basis of clear and convincing evidence, that the respondent had abandoned her two children.

## II

The respondent next presents a two-part challenge to the trial court's finding that she failed to rehabilitate herself within the meaning of General Statutes § 17-43a (b) (2). The respondent first argues that because she was unaware of the court's expectations regarding her conduct, she could not be considered to have failed to rehabilitate herself. She also contends that the petitioner failed to provide clear and convincing evidence that she failed to rehabilitate herself within the meaning of the statute. We are not persuaded.

Section 17-43a (b) (2) empowers the trial court to grant a petition to terminate parental rights if it finds, upon clear and convincing evidence, that " 'the [parent] of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [the parent] could assume a responsible position in the life of the child.' " *In re Sarah M.*, 19 Conn. App. 371, 376, 562 A.2d 566 (1989); *In re Rayna M.*, supra, 31.

" 'Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." *In re Migdalia M.*, supra, 203. The statute does not require the respondent to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. Our Supreme Court has held that § 17-43a (b) (2) "requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable 'within a reasonable time.' " *In re Luis C.*, supra, 167. Moreover, the court must also consider the six factors in § 17-43a (d)[10] when determining whether a parent has failed to achieve

---

[10] General Statutes (Rev. to 1989) § 17-43a (d) (now § 17a-112) provides: "Except in cases where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

rehabilitation. *In re Shavoughn K.,* 13 Conn. App. 91, 98, 534 A.2d 1243 (1987), cert. denied, 207 Conn. 805, 540 A.2d 374 (1988).

## A

In the first part of her claim, the respondent argues that she never was notified of any court expectations and there cannot be a finding of failure to rehabilitate because she had no idea what was expected of her. It is undisputed that on the date of commitment the court failed to articulate expectations that would lead to reunification of the family, that the respondent was not present at the commitment, that she never provided DCYS with a reliable way to contact her, and that DCYS was unable to negotiate a service agreement with the respondent. The failure to articulate expectations or to convey them to the respondent, however, does not in and of itself preclude a finding of failure to rehabilitate.

The respondent fails to note that § 17-43a (b) (2) does not provide that in order to achieve personal rehabilitation a parent must meet the expectations of a court as ordered pursuant to a commitment hearing. See *In re Juvenile Appeal (Docket No. 10718),* 188 Conn. 259, 263 n.4, 449 A.2d 165 (1982). Nor have our courts required an articulation of expectations or strict compliance thereto as a condition precedent to a finding of failure to rehabilitate. See *In re Shavoughn K.,* supra, 99–100.

Moreover, the respondent's reliance on *In re Migdalia M.,* supra, is wholly misplaced. She argues that because in that case we reversed the trial court's termination of parental rights, on the basis of the parent's failure to follow the court expectations, "[i]t is then only logical to conclude that where there are no court expectations that there then cannot be a finding of failure to rehabilitate." Here, the failure to inform the respon-

dent of the expectations and to have her sign the service agreement drafted by DCYS is inapposite because the trial court neither relied on nor even mentioned the expectations in reaching its conclusion. The trial court relied on the respondent's failure to correct any of the factors that led to the initial commitment, not her failure to meet specific expectations. Thus, this portion of the respondent's claim must fail.

## B

In the second prong of this argument the respondent contends that the petitioner failed to establish by clear and convincing evidence that she had failed to rehabilitate herself. A determination by the trial court under § 17-43a (b) (2) that the evidence is clear and convincing that the parent has not rehabilitated herself will be disturbed only if that finding is " 'not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* [supra], 221–22.' " *In re Luis C.,* supra, 166, quoting *In re Juvenile Appeal (84-3),* supra, 478.

Our review of the record discloses that the trial court considered the statutory criteria of personal rehabilitation within the meaning of § 17-43a (b) (2) and the six factors listed in § 17-43a (d) and concluded properly that the petitioner had presented clear and convincing evidence that the respondent failed to rehabilitate herself as required under the statute. The trial court stated the ultimate issue as "whether the parent is more able to resume the responsibilities of parenting at the time of filing the termination petition than she was at the time of commitment."[11] In attempt-

---

[11] The issue of whether parental rights should be terminated must be decided by the trial court on the basis of conditions existing at the time of the trial. *In re Juvenile Appeal (83-DE),* 190 Conn. 310, 318, 460 A.2d 1277 (1983).

ing to resolve this question, the trial court relied on the court-ordered evaluations and the trial testimony of Mantell, the court-appointed psychologist,[12] that the respondent was reluctant to participate in the evaluation despite her knowledge that it was ordered by the court, that she refused to admit that her substance abuse contributed to the commitment of her children or that her children were neglected, and that she had a lengthy history of arrests. Mantell described the respondent as "an irritable, angry person with a substantial history of psychological adjustment problems, antisocial behavior and a difficult history" whose "behavior was often abrupt, stern and hostile" while interacting with her children. In his final report Mantell concluded that "[t]he mother's behavioral presentation does indicate immaturity, questionable judgment and partiality in her responses to her children as well as the general demeanor of a playmate rather than that of a nurturing and structuring parent." He testified at trial that the respondent was irritable and impatient during her evaluation and refused to remain for the entire evaluation. He also testified that, given her failure to acknowledge the contribution of her substance abuse to the commitment of her children, the likelihood of her rehabilitation in terms of drug and alcohol abuse was poor. He concluded that these factors indicate that "at the time she was interviewed, that she still did not properly appreciate the importance of the kinds of habits she had, for breaking her relationship with her children, and causing her to [lose] custody of them."

In its memorandum of decision, the court concluded that the respondent's ability to care for the children had deteriorated from the time of their commitment and that, although the respondent claimed to have

---

[12] The testimony of professionals is given great weight in parental termination proceedings. See *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987).

ceased using drugs, she did so only after she was incarcerated. Accordingly, the court found nothing in the evidence presented to permit an inference that within a reasonable time after the respondent's release she would be any more capable of caring adequately for her two children than she had been during the year preceding their commitment or during the fifteen months subsequent thereto. Because we conclude that the trial court's findings were supported by Mantell's testimony, this prong of the respondent's claim therefore also fails.

## III

In her final claim, the respondent argues that the trial court improperly found, by clear and convincing evidence, that there was no ongoing parent-child relationship between the respondent and her children within the meaning of General Statutes § 17-43a (b) (4), and that to allow further time for the establishment of such a relationship would be detrimental to the best interests of the children. See General Statutes § 17-43a (b) (4). This part of the statute requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists, and, second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. *In re Juvenile Appeal (Anonymous)*, supra, 670; *In re Juvenile Appeal (84-6)*, supra, 708; *In re Juvenile Appeal (84-3)*, supra, 477. The "best interest" standard, therefore, does not become relevant until after it has been determined that no parent-child relationship exists. *In re Juvenile Appeal (84-3)*, supra, 480.

Our Supreme Court has concluded that: "The statute's definition of an 'ongoing parent child relationship' as 'the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis

the physical, emotional, moral and educational needs of the child' is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation." *In re Jessica M.*, 217 Conn. 459, 467–68, 586 A.2d 597 (1991).[13] When our Supreme Court first construed this statutory language, however, it resolved this ambiguity by holding that "[i]t is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." *In re Juvenile Appeal (Anonymous)*, supra, 670; *In re Jessica M.*, supra, 468; *In re Juvenile Appeal (84-6)*, supra, 708–709. This standard contemplates a relationship that has some positive attributes. *In re Jessica M.*, supra, 470. In considering whether an ongoing parent child relationship exists, we must consider the feelings of the child. *In re Megan M.*, 24 Conn. App. 338, 341, 588 A.2d 239 (1991); *In re Juvenile Appeal (84-6)*, supra, 709.

This court, in *In re Juvenile Appeal (84-6)*, supra, concluded that "in applying [the] definition [of no ongoing parent-child relationship] . . . we focus on 'the ultimate question [of] whether the child has no present memories or feelings *for* the natural parent.' . . . Common sense and the avoidance of bizarre results dictate that we read the language in its ordinary meaning. . . . As used here, 'for' means 'what is said or felt in favor of someone or something: pro.' Webster, Third New Inter-

---

[13] In *In re Jessica M.*, 217 Conn. 459, 468 n.6, 586 A.2d 597 (1991), the Supreme Court defined "no ongoing parent-child relationship" in the context of General Statutes § 45-61f and concluded that, with regard to that language, §§ 45-61f and 17-43a (b) are identical because "[e]ach was enacted by Public Acts 1974, No. 74-164, and nothing in the legislative history suggests that they should be construed differently."

national Dictionary." (Emphasis in original.) Thus the court concluded "that the phrase 'feelings for the natural parent' refers to feelings of a positive nature. It does not encompass . . . psychologically corrosive and destructive feelings . . . ." Id.

With regard to Mamie, the trial court concluded that "there is clearly no relationship whatsoever between Mamie, who last lived with her mother at the age of thirteen months, and Gwen. Mamie refers to her [mother] as 'some boy' and evidences an unequivocal psychological bonding with her foster mother of the preceding year." In reaching these conclusions, the trial court again relied primarily on the evaluations and testimony of Mantell. Mantell found "nothing . . . distinguishable about [Mamie's] relationship with the mother that would help [Mantell] to describe it in ways that are different from the child's relationship, for example, with [Mantell's] colleague . . . . Or for that matter with [Mantell]. As far as the mother is concerned, [she] showed distinct disinterest in Mamie. And much of her behavior toward the child was either one of avoiding or ignoring the child or specifically rejecting her." Mantell further noted that the respondent showed an interest in Mamie only when she learned that the evaluator was recording everyone's actions. He found no evidence that the child had any sense of a relationship with the respondent, and based this finding, in part, on the fact that when, during the third evaluation, he asked Mamie to bring her mother to speak with him, Mamie returned with her foster mother, despite the fact that she had to walk right by the respondent to reach her foster mother, and that when Mamie was asked to say goodbye to her mother at the conclusion of the third evaluation she turned to her foster mother to say goodbye and appeared confused when she was told she had chosen the wrong person.

With regard to Michael, although the trial court noted that he had a clearer memory of his mother and a weaker bond with his foster mother, it concluded that "[e]ven Michael, by the time of the completed evaluation, did not display any positive feelings for his mother, nor . . . any present positive memories or emotional ties with her." This conclusion is also supported by Mantell's testimony and observations. At the beginning of the third evaluation, Michael's foster mother pointed to the respondent and asked him who she was. Michael responded that he did not know. Later during the evaluation, when Mantell asked Michael to bring his mother to speak with him, Michael walked right past the respondent, looked at Mamie's foster mother and his present foster mother, who were standing together, and returned with his present foster mother. Moreover, noting that Michael has many psychological mothers, including his present foster mother, Mantell indicated that the respondent and Michael interacted primarily as playmates and indicated that Michael's foster mother had informed him that after each visit with the respondent, Michael's behavior was disordered and took days to return to normal.

The court also found clear and convincing evidence that "[b]ased upon Gwen's personal, psychological and legal situation, it is clear that to allow still further time for her to reestablish a parent-child relationship would be detrimental to each child." Here, too, the record amply supports the trial court's findings. Mantell testified that the respondent, when released from prison, would have a poor prognosis for maintaining a therapeutic relationship or counseling relationship necessary to learn proper parenting and that if Mamie was exposed to the respondent with any consistency "it could cause her to doubt herself and to feel disliked and unwanted, and so to develop unhealthy attitudes toward herself." Mantell also recommended against

allowing continued time for a parent-child relationship to develop between the respondent and Michael because "the arrangement of his life situation . . . provides a confusing array of possible identifications [and his] psychological parenthood . . . appears to be multiple."

The judgment is affirmed.

In this opinion the other judges concurred.