MEMORANDUM OF DECISION
On February 18, 1998, the Department of Children and Families, hereafter "DCF" filed a petition for the termination of the parental rights of Jennifer S. and Robert D. to their son, Jason D., born September 2, 1996. Jason has been committed to the care and custody of DCF since March 7, 1997 when he was adjudicated a neglected and uncared-for child. He has never been in the daily care of his parents and was placed in foster care after his discharge from the hospital in which he was born.
On the first day of trial, February 1, 1999, Jennifer consented to the termination of her parental rights. The court CT Page 1537 accepted her consent, having found that it was knowingly and voluntarily made with the advice and assistance of competent counsel. The petition was amended to reflect her consent. The allegations against the biological father are that: (1) he has abandoned the child in that he has failed to maintain a reasonable degree of interest, concern and responsibility for the welfare of the child and (2) Jason has previously been adjudicated neglected and that his father has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in his life. Connecticut General Statutes § 17a-112(c)(3)(A) and (B). Each of Jason's grandmothers was permitted to intervene in the pending termination petition. In addition, both the maternal and paternal grandmothers have filed motions for transfer of guardianship of Jason to them, which were consolidated with the termination petition for trial. For the reasons stated below, the court grants the termination petition and denies the motions for transfer of guardianship.
From the evidence, the court makes the following factual findings:
 1. FACTS
Robert D. and Jennifer S. had been involved with each other for a short period of time when their first and only child was born. Theirs was and is a volatile relationship, characterized with arguments, domestic violence and chaotic living conditions. Jennifer, who was nineteen when her child was born, has significant physical handicaps due to her cerebral palsy which has caused significant weakness on her left side. She walks with a limp and does not have the full use of her left arm. In addition, Jennifer suffers from cognitive impairments, which make aspects of normal living difficult for her, although she has been able to maintain employment in the time that Jason has been in foster care. Nonetheless, the parent educator testified that Jennifer would not be able to parent Jason without twenty-four hour assistance, essentially to have a mother to help her parent her child.
Robert D., while not physically handicapped as Jennifer is, has other limitations and has an unspecified disability, for which he receives social security disability income. He is now twenty-six years old and was twenty-four when the child was born. CT Page 1538 He has held sporadic employment as a custodian from time to time, but admitted to the court appointed psychologist evaluator that he watches television until the early hours of the morning and so finds it very difficult to keep normal working hours.
When Jason was born on September 2, 1996, the hospital staff alerted DCF concerning the family. Robert and Jennifer were bickering about the child, Robert's mother and he had to be removed from the delivery room and there were also altercations between the grandmothers. The interfamily conflicts continued when Jason's medical condition required his transfer to another hospital. The professionals found that neither the parents nor the grandparents appeared to understand issues concerning basic infant care. None of them could understand, despite repeated instruction, that they could not hold a new born infant who had to be intubated. The staff did not believe that the family could care for this child and DCF secured a court order for temporary custody of Jason. Upon his discharge from the hospital, Jason was placed in foster care.
Thereafter, DCF embarked upon significant efforts to rehabilitate Jason's parents to be able to return their infant to them. During the first three months of the child's birth, there was visitation with both parents weekly and the parenting educator began to work with them providing them with information about infants and individual parenting education instruction. On January 1, 1997, Ms. Karen Scotti became involved with the parents and continues to meet with them to the present time. She is a resource specialist who assists parents and conducts visits in the home when the child is present to provide her services. She indicated that her program together with parents sets individual goals for parents and then provides the services to assist them in meeting those goals. In the case of Robert, she testified, there were issues of basic child care, safety, nutrition and health; for example learning how to feed, diaper and clothe a child. As Jason got older and had different needs, the training focused on those needs as they altered over time. She testified that Robert D. made very little progress towards the goals set for him. When the visitation took place together with Jennifer, often he and Jennifer would bicker and verbally fight in front of the child. During many visits, Robert D. became focused on his own issues, for example playing with a toy himself or discussing his concerns. His own needs, she stated, came before Jason. She indicated at those times when Robert was able to focus on the child, that he did interact well with him for CT Page 1539 short periods of time.
Robert's inability to parent Jason was also observed by the DCF social worker and the social services assistant. The social worker assistant stated that at some of the visits she observed, Robert did not acknowledge Jason, he would ignore the child and fight with the mother. On other occasions, he would stare out the window at the young social workers coming to the building or the college students walking on the street and make comments about them. Sometimes, Robert would take a toy away from Jason and play with it himself and other times he would not let Jason play. He did not send gifts, recognize the child's birthdays or inquire in any meaningful way about the child's development and progress. Over the course of time during the pendency of the case, he made no progress in learning how to parent a small child. Inexplicably, for a period of about six months from April of 1997 until September of 1997, Robert left the area and did not visit with his son at all, although he could have enjoyed regular weekly visitation with Jason during this entire time.
Robert also physically fought with Jennifer on several occasions and DFC referred him for domestic violence counseling. He did not attend or participate. He was referred for individual therapy and also to a psychiatrist. When he canceled two appointments, he was then referred to a therapist at United Services in February, 1997. Again he did not participate and was then discharged from the program for non-compliance. He was also referred to a program at United Services for substance abuse counseling and anger management, a program he completed with Eleanor Cresson. In January, 1998, when Robert D. told the DCF worker he was depressed, he was again referred to United Services for counseling. Robert informed the counselor that he had no intention of doing what DCF wanted him to do and he has not participated in individual counseling. The court concludes, from the evidence, that Robert D. rejected many services to which he was referred and only minimally complied with others. Robert D. was arrested in May, 1998 for disorderly conduct, and twice in September of 1998 for breach of the peace, for which he paid fines. The pending disorderly conduct charge was in connection with yet one more fight with Jennifer, after which he was ordered by the court to attend anger management and domestic violence counseling. Given his criminal arrest record, it is apparent and the court concludes that Robert D. did not benefit from the anger management program nor did any of his counseling enable him to address his interpersonal violence issues. CT Page 1540
Robert D. also suffers from significant impairments and he has failed to take the steps necessary to rehabilitate himself, so that he could care for Jason. Dr. David Mantell, who completed a psychological evaluation of the family on November 13, 1997, testified that:
 "The father is a very troubled person with poor personal control, with a history of violence against members of the mother's family including the mother herself."
He stated that he observed a great deal of anger and tension among the family members who had chronically conflicted, over involved and angry relationships with no reasonable boundaries. In his written report, he found Robert to be "self-involved, immature, and learning disabled, as he reports, with a history of substance abuse, obsessive compulsive disorder and narcissism." Dr. Mantell found the relationships among all of the adults including the grandparents to be unusual, extreme and basically pathological.
Dr. Richard Sadler, the court-appointed psychiatrist, shared his colleague's view of Robert D. Dr. Sadler's evaluation was completed on June 13, 1998. He noted that Robert received disability for a condition he could not describe and was an unreliable and misleading historian of the major events in his life. He concluded that:
 "Mr. D. has not demonstrated an ability to effectively care for himself, his girlfriend or his child. . . . (He) is self-absorbed and he is not responsive to the needs of his girlfriend. He is impulsive and he is intermittently physically aggressive and Mr. D. does not hold himself responsible for his actions. Mr. D. is not gaining in his abilities to care for a child, he has not refrained from confrontations with his girlfriend and he has not demonstrated a willingness or ability to neglect his own desires in order to meet the needs of this child."
In his parenting efforts as well as his personal rehabilitative efforts, Robert D. has gone through the motions, but has not gained in insight or grown at all, despite considerable services and effort on the part of DFC to assist him. The court concludes, from the clear and convincing evidence, that Robert D. has not rehabilitated himself so that he could care for Jason in the CT Page 1541 foreseeable future, given Jason's age and needs.
 2. TERMINATION ADJUDICATION A. Reunification
In order to terminate a parent's right to his child, DCF must show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parents, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Connecticut General Statutes 17a-112(c)(1). As previously found, DCF arranged for significant parenting support for Robert D. and services during visitation. DCF also referred Robert to the various mental health services which he required. Based on these efforts, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify Jason with his father, Robert D.
B. Statutory Grounds for Termination
In order to succeed in a termination of parental rights case, DCF must prove by clear and convincing evidence that at least one of the several statutory grounds for termination exists. The first ground alleged against Robert D. is that he has abandoned Jason. Connecticut General Statutes § 17a-112 (c)(3)(A). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). This ground focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); [The abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In re Kezia M.,33 Conn. App. 12, 18, 632 A.2d 1122 (1993).
While Robert D., with the exception of one six month period, has visited with Jason on a fairly regular basis, his visits have had more the character of "going through the motions" and have not demonstrated behavior that evidences a true concern and love and affection for Jason. Robert has not inquired about this child, often he has been distracted and uninterested in the child during visits. He has made no effort to learn about Jason's developmental issues, to send him cards or gifts or to recognize CT Page 1542 his birthdays or other important holidays. The court concludes that within the meaning of the statute, Robert D. has abandoned this child and that DFC has proven that abandonment by clear and convincing evidence. The court further finds that this ground existed for more than one year prior to the filing of the termination petition on January 18, 1998.
The second ground alleged is that Jason was adjudicated a neglected and uncared-for child and that his father has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in his life. Connecticut General Statutes § 17a-112(c)(3)(B). The court finds, as set forth in detail above, by clear and convincing evidence, that Robert D. has failed in his rehabilitative efforts. He has not taken the necessary steps to address the issues which prevented him from being able to parent this child. The court also finds that this ground existed for more than one year prior to the filing of the termination petition.
 3. THE GRANDMOTHERS' MOTIONS FOR TRANSFER OF GUARDIANSHIP A. The Paternal Grandmother, Mrs. Deborah D.
While Robert's mother, Deborah D., saw her grandchild, Jason, in the hospital shortly after he was born, she had no further contact with the child until several visits together with her son beginning in September of 1997. Initially, she gave the DFC social worker the impression and apparently stated that she thought Jason was best placed in foster care. However, beginning the summer of 1997, she began to request visitation with Jason, knowing that Jennifer's mother, Jason's other grandmother, had visitation. The DFC worker told her that she would need to work through her son, who was then not visiting. When Robert's visitation resumed after he returned from Florida after being away for six months, Deborah D. was permitted to visit Jason during the visits that Robert had with him. She attended a total of three visits, testifying that she could not get the time off from work.
DCF did investigate her home and family as a possible placement resource for the child and concluded that the home was not suitable, as her present husband has a criminal record. At trial, she testified that she is separated from her husband, but CT Page 1543 this was not information provided earlier to DCF. At the time she was informed that DCF was not considering her a placement resource, she took no further steps to press her claim to access to the child. Finally, when the termination petition was filed on January 12, 1998, she filed a motion for custody on February 25, 1998, which the court takes to be a request for transfer of guardianship of the child to her.
In considering such a motion, the court is guided by what is in the best interests of the child. Deborah D. has the burden of proving by a fair preponderance of the evidence that the transfer is in Jason's best interests. The court cannot find a transfer of guardianship to her to be in Jason's best interests and therefore denies the motion for the reasons set forth below. Initially, the court finds that Jason has no relationship with his paternal grandmother, as she did not come forward quickly after he was placed in foster care in 1996 to establish such a relationship. Further, she was ambivalent about being a resource for the child in 1996 and 1997. In addition, she was part of the extended family evaluated by Dr. Richard Sadler in August, 1998. Even at that late date, she expressed her desire for Jason to be cared for by his parents. Dr. Sadler found that Deborah D. "showed an emotional distorted view of her son which has seriously interfered with her judgment regarding the best interests of her grandchild." He concluded that "in spite of her verbal protests to the contrary, Mrs. D. has not demonstrated over the past two years an ability to be a viable resource for Jason's care. Mrs. D. does not appear to be emotionally disturbed over the consequences of her actions or by the results of Jason's continued foster care placement."
Mrs. D., through her counsel, argues that DCF did not inform her of her rights and the legal steps she could take to establish visitation with her grandson and prevented her from having a relationship with Jason. But DCF's statutory obligation is to attempt to reunite the parents with their child and only secondarily consider collateral relatives, to the extent they make themselves known to DCF and express their position and concern about a child unequivocally. There was nothing to prevent Mrs. D. from filing a motion for transfer of guardianship in the neglect petition, almost immediately after Jason was placed in foster care. There was nothing to prevent her from filing motions for visitation at that time to establish and maintain a relationship with a child, who now does not know her at all. The court concludes, in considering Mrs. D.'s actions, rather than CT Page 1544 her statements, that she has had mixed feelings about taking on the care of a young child at this stage in her life. The court understands that in the abstract she believes she loves the child and that she is distressed that he may be lost to his family of origin. But for a young, vulnerable infant to wait over a year and one-half to finally have a biologically connected family member express through words, rather than concrete action, a desire to provide care for that child remains too little and too late to nurture him. The court, as stated, concludes that a transfer of guardianship to Deborah D. is not in Jason's best interests.
B. The Maternal Grandmother, Mrs. Jenilu Z.
Jason's maternal grandmother has had significantly more contact with Jason than his paternal grandmother, in part because when Jennifer returned home to live with her mother, visitation with Jason took place in her house. DCF also considered her family as a possible placement resource, but informed her by letter dated on January 7, 1998 that it would not place Jason with her. Visitation continued with the maternal grandmother through June, 1998, at which time it was curtailed.
But Jerilu Z. has some of the same difficulties concerning her daughter that Deborah D. has had with her son. She did and does not seem capable or willing until recently to recognize and deal with the limitations which her daughter unfortunately possesses. Rather than proactively working with these limitations and reaching the conclusion before the child's birth that it was unlikely that her daughter, given her physical condition and her stormy relationship with her boyfriend, could care for an infant, and taking legal steps at his birth such as seeking an order from the Probate Court, she, too, awaited developments, hoping against hope that things would improve.
Dr. Mantell concluded, based on the intense, conflicted and pathological relationships that he saw, that Jenilu Z. was emotionally enmeshed with her daughter. In her interaction with Jason, Dr. Mantell found Mrs. Z. to take control and dominate, even to the extent of not permitting the child a normal scope of self-determination in his play. She also did not permit Jennifer, who he concluded had the best connection to Jason, to parent her son, but took over and controlled the interactions. In November of 1997, Dr. Mantell could not support placement of Jason in his maternal grandmother's care. CT Page 1545
In addition to his concerns about Jenilu Z., he had deep reservations about Jason's step-grandfather. He observed Mr. Z.'s discomfort with the child. Mr. Z. was evaluated by Dr. Mantell in the same series of interviews in which his wife, the parents and Jason participated. Mr. Z. had not visited with the child nor taken much interest in him, citing work-related reasons for not visiting. He expected that his wife would provide the primary care for the child. During the evaluation, Mr. Z. was tense and angry. Dr. Mantell found Mr. Z. "presented as psychologically distant, socially uncomfortable with anger control difficulty. There is clear rigidity in his personality that makes it hard for him to adjust to new circumstances and to meet the emotional and social demands of new situations." He testified at trial that Mr. Z.'s anger interfered with his ability to relate to the chid. In part, his attitude toward Robert contributed to his anger. Dr. Mantell stated Mr. Z. believed that his stepdaughter had borne a child with a lazy n'ere do well and that his step daughter would not follow his guidance."
These conclusions were shared by Dr. Sadler when he evaluated the family in 1998. In fact, Dr. Sadler found it "outrageous" that neither of the grandmothers or the step-grandfather had moved closer in a period of two years to providing care for Jason, when each of the parents was so seriously impaired. He concluded that there were "indications of an excessive rigidity to Mr. Z.'s interpersonal relationships and a rigidity and unhelpful intensity to his judgments and opinions." Dr. Sadler also noted that "Mr. Z. professes his devotion to children and he has been able to visit his grandchild twice during the two years in which his grandchild's custody has been under dispute." The court also notes that Mr. Z. did not attend the trial nor testify in support of his wife's motion for custody, or as the court takes it, transfer of guardianship.
Given the court's own observations and the fact that neither Jenilu Z. nor Mr. Z. have addressed their own interpersonal problems and the issues identified by Dr. Mantell in November of 1997, the court cannot find that it is in Jason's best interests to be placed with them.
Jason, the DCF social workers have testified, is doing well in his foster home placement where he has been for the last nineteen months. He is meeting his normal developmental milestones and has recovered from his early deficits. He is CT Page 1546 bonded to the foster mother and father. The foster mother is dedicated to doing everything possible for Jason's welfare. The social worker also testified that Jason has fit into the foster family well. They hope to be able to adopt Jason, should he become free for adoption.
 4. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e) concerning the biological father, Robert D.;
1) The timeliness, nature and extent of services offered and made available to the parents and the child in order to facilitate the reunion of the child with the parent; DCF offered intensive reunification services to keep this family together from the time of the child's birth, as previously found. Neither parent was able ultimately to benefit from those services. Robert D. did not accept some of the services offered to him and did not learn from the anger management and parenting courses that he did attend.
2) As previously stated, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The services offered during visitation were extensive, far beyond what is often available for young parents.
3) The terms of an applicable court order or services agreements entered into and agreed upon by any individual agency and the parent and the extent to which all parties have fulfilled their obligations under such order; DCF entered into a service agreement with Robert D. on January 1, 1997 which required him to: (1) accept and follow through with referrals, (2) continue with the parenting services and follow specific parenting recommendations and expectations, (3) not to miss any counseling appointments, (4) to visit with Jason on all offered times, (5) to have no further domestic violence incidents with family members, (6) to permit Jennifer to leave the home due to safety issues, (7) to enroll in domestic violence services, (8) to enroll in parenting classes, (9) to cooperate with DCF and all services providers. Similar court expectations were also set. Robert complied with very few of the referrals, as indicated, and failed to substantially comply with the service agreement and the expectations. Robert did not address his counseling needs and the CT Page 1547 issues that prevented him from being able to parent his child.
4) Finding as to the feelings and emotional ties of the child with respect to the parents and foster parents: Jason views his foster parents as his mother and father; he has no positive ties to his mother and father. his foster parents are committed to caring for him until he becomes an adult, and wish to adopt him.
5) Finding regarding the age of the child. Jason is now two years and five months old. He has been in foster care all of his life and requires permanency for his proper development during his childhood. The court is aware of and acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also held, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 741, 596 A.2d 930 (1991); see generally, JOSEPH GOLDSTEIN, ETAL., BEYOND THE BEST INTERESTS OFTHE CHILD 99 (1979.)
6) Finding regarding efforts of the father to adjust his circumstances, conduct or conditions to make it in the best interests of the child to return him to his home in the foreseeable future and (A) the extent to which the father has maintained contact with the child as part of an effort to reunite the child with his father, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As has previously been found, while Robert D. has in general maintained contact with Jason, he has not adjusted his behavior to make a return of the child to him possible. He has been a passive and uninvolved participant in visitation and has not begun to address his personal issues concerning anger management and his propensity to domestic violence. Given the fact that more than two years have elapsed since the child's birth and given the varied and intensive services offered and provided to Robert, there is no hope that he will be able to care for Jason at any time in the future.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the CT Page 1548 economic circumstances of the parent. No such conduct is noted. Robert D. has not been prevented from maintaining a reasonable relationship with his son by any other person or economic circumstances. The failure to establish a relationship with his son rests squarely on his own shoulders because of his own acts and lack of initiative.
 5. DISPOSITION
Jason is flourishing in his present home. He is beginning to overcome his early deficits and is developing normally. Jason needs the permanency, stability and consistency provided by his present placement. The court finds, based on the clear and convincing evidence, that it is in Jason's best interests to terminate his parents' rights to him. These findings are made after considering the special needs of this child, the length of time he had been separated from his parents, as well as his demonstrated need for a secure and permanent environment.
The court ORDERS that the parental rights of Jennifer S. and Robert D. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. As the foster parents wish to adopt Jason, the court directs they be given first consideration. Further, a permanency plan for Jason shall be submitted within ninety days. A review plan for him shall be filed in accordance with state and federal law.
________________________________ Barbara M. Quinn, Judge Child Protection Session