MEMORANDUM OF DECISION
I. INTRODUCTION
This case presents a petition filed on August 17, 1998 by the Department of Children and Families (hereinafter referred to as the "petitioner" or "DCF") which seeks the termination of the parental rights of Jeanne P. and Shane P. to their now eight and one half year old daughter, Stephanie P.
At the commencement of trial, Shane executed an affidavit consenting to the termination of his parental rights which, after a full canvass in the presence of his attorney, resulted in a finding by the court that said consent was knowingly and voluntarily made and was a valid ground for terminating his parental rights. The father then requested permission to return to the correctional institution from whence he came as he had no desire to remain in attendance during the trial. The court, therefore, excused Shane although his attorney did fully participate in the subsequent proceedings.
II. HISTORY OF PROCEEDINGS
CT Page 6575
Court proceedings originated on August 30, 1995 when the petitioner filed a petition against Stephanie's mother and father alleging that said child was neglected in that she was being permitted to live under conditions, circumstances or associations injurious to her health. Connecticut General Statutes §46b-120 (8). On September 8, 1995, an order of temporary custody was issued by the court (Doherty, J.) which was confirmed on September 15, 1995. On August 23, 1996 the court (Dennis, J.) adjudicated the child as a neglected child and committed Stephanie to the care and custody of the petitioner. Extensions of that commitment were granted by the court on July 25, 1997 (Dennis, J.) and July 1, 1998 (Swienton, J.). The current commitment order will expire on August 23, 1999.
The court finds that the mother and father have appeared and have court-appointed attorneys, as does the child. The court has jurisdiction in this matter. There is no pending action affecting the custody of Stephanie in any other court.
Although father has consented to the termination, mother remains steadfastly opposed to the termination of her parental fights. The petitioner has proceeded against the mother on the ground that she is the parent of a child who in a prior proceeding was found to be neglected and has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child: Connecticut General Statutes § 17a-112
(c)(3)(B)(1).
The court, having read the verified petitions, the social studies and the various documents entered into evidence, and having heard the testimony of the witnesses, does hereby make the following findings:
III. FACTS
Stephanie is one of three children born to Jeanne P., all of whom were the subject of the neglect petition, order of temporary custody and order of commitment previously referred to herein.[2] Carissa was born November 6, 1981, Stephanie born January 20, 1991 and Destiny on August 3, 1995 each of whom were fathered by different men. CT Page 6576
The neglect petition was filed twenty-seven days after Destiny's birth due to, inter alia, Jeanne's abuse of cocaine evidenced by the fact that Destiny was born with cocaine in her system. DCF was also concerned about information that Jeanne's boyfriend was selling drugs from the residence and that he, as was the case with all three children's fathers, was also prone to engage in the verbal and physical abuse of Jeanne. The order of temporary custody was sought and obtained by DCF only eight days after the petition was filed as a consequence of a fire which engulfed Jeanne's residence and which was started by then four-year old Stephanie at approximately 11:00 a.m. while Jeanne was sound asleep due to the apparent influence of "Nyquill". The infant Destiny inhaled so much smoke that she had to be transported to the hospital by Life Star helicopter with life-threatening symptoms which fortunately were successfully treated by emergency room personnel.
Her three children having been removed from her custody, Jeanne followed DCF's recommendation and participated in a substance abuse evaluation at the McCall Foundation which resulted in her successful completion of a thirty-day inpatient program at the Carnes-Weeks Center. At discharge on December 1, 1995, the program providers recommended that Jeanne stay abstinent and avoid abusive relationships. She was then referred to McCall's for outpatient follow-up and to the Susan B. Anthony program for abused women. (Respondent's Exhibit #1). By August 1996, Jeanne was making significant progress in attaining the goal of reunification with her children. She had several negative tests for substance use, had found an apartment adequate for the children's needs and was regularly attending substance abuse group meetings. DCF had contracted with N.O.W. Inc. of Waterbury to implement a full-service intensive reunification program on Jeanne's behalf. On August 19, 1996, however, a DCF social worker spotted Henry S. on Jeanne's couch, a person known to the petitioner to have a criminal record to include convictions for domestic violence and who was a drug user and suspected dealer.
At the hearing on August 23. 1996 which resulted in the neglect adjudication and commitment order, the court (Dennis, J.) issued certain expectations to Jeanne which she then signed (State's Exhibit 1) and specifically ordered her to have no contact with Henry S.[3] It is important to note that below Stephanie's signature is the following advisement:
 "Note to Parents:
CT Page 6577 If you fulfill the court's expectations, you will improve your chances of regaining, or keeping, guardianship of your child permanently. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker." (Emphasis added.)
Among the expectations that Jeanne needed to fulfill were attendance at parenting classes, continued participation in substance abuse counseling and treatment and submission to random drug tests. Jeanne also agreed to follow the recommendations of DCF and the service providers and was obligated to keep her whereabouts known to the department. In October, 1996, due to the suspected involvement of mother with Henry S. and the subsequent commitment of the children, the N.O.W. reunification program was suspended, pending follow thru on the expectations and the outcome of a court-ordered psychological evaluation. The N.O.W. report, while noting that Jeanne did well in the program and did regain the ability to parent her children, recommended that she complete parenting classes and the physical abuse program at Susan B. Anthony as prerequisites for the return of her children. (Respondent's Exhibit #8).
On December 5, 1996 Dr. David M. Mantel, a clinical psychologist, performed his first of three court ordered evaluations. The initial evaluation was of Jeanne and all three children. (State's Exhibit #9). Noting mother's transient residential pattern, her abuse of cocaine and her past physically abusive relationships with the father's of the children and her boyfriends, Dr. Mantel testified that Jeanne had no insight as to the danger to the children posed by her relationships and her behavior. Although denying any continuation of her relationship with Henry S. to DCF workers, Jeanne admitted to Dr. Mantel that the relationship was going well and that she thought the no contact order was "wrong". During her evaluation, then five and a half year old Stephanie told the evaluator that her mom did drugs and her dad was in jail. At the trial Dr. Mantel opined that the child was carrying a strong burden of negative information about her parents. Nonetheless, Dr. Mantel found that, as of the date of the evaluation, Stephanie had a significant and powerful attachment to her mother and wanted to go home with her. She referred to Jeanne as "my very special mommy". Dr. Mantel CT Page 6578 recommended a careful, ordered plan to return first Stephanie then Destiny to mother.[4] Reunification efforts, however, would be thwarted by evidence that Jeanne was abusing drugs and by her association with drug users or persons who had a history of physical violence. Mother was to strictly adhere to court-ordered guidelines and, as Dr. Mandell testified, needed to revise the way she lived as she was part of "an anti-social sub-culture".
For six months into 1997, the reunification plan was proceeding slowly due to a few bumps in the road, but proceeding nonetheless. Although Jeanne did not participate in parenting classes or the Susan B. Anthony program and consistently refused to participate in a hair analysis drug test and although DCF had some grounded suspicion that Henry S. was not out of the picture, unsupervised visits with the children were increased in frequency and length. By the beginning of June, visits were five times per week and some weekends and the plan was to return Stephanie to her mother by July or August. (State's Exhibit #3, page 2). Jeanne had signed a service agreement with DCF on May 23, 1997 wherein she agreed to attend parenting classes at McCall Foundation and submit to the hair analysis. The hair sample was taken on June 3rd and the results, communicated to DCF on June 17th, were positive for cocaine use. (State's Exhibit #5). An individual treatment plan was then prepared at a case review conference which Jeanne failed to attend recommending a drug evaluation at McCall no later than June 25th and the completion of parenting classes by September 23rd (State's Exhibit #3). During the testimony at trial, Jeanne acknowledged receipt of the plan and that she was aware of the recommendations provided therein. Unsupervised visits with the children were immediately suspended.
For the three month period that followed the positive drug test, Jeanne persistently refused to discuss further substance abuse treatment with the DCF workers and failed to attend two evaluations set up by the department at McCall. On August 14, 1997 the local newspaper contained a piece about a domestic violence arrest at a local bar — those arrested were Jeanne P. and Henry S.
Thereafter, a referral was made to Jewish Family Services by DCF to perform an assessment as to options available to Stephanie, i.e., guardianship, adoption or reunification. DCF began to seek out a permanent placement with a relative and by CT Page 6579 mid October, 1997, after Jeanne had again refused substance abuse evaluation, refused to sign another service agreement, and refused to meet with department personnel, the petitioner certified Josephine J. an appropriate relative placement for Stephanie.[5] The child arrived at the residence of Josephine and her significant other on October 17, 1997 and remains there to this day. This placement was Stephanie's fourth foster placement since her removal from her mother's care.
Within a week of her placement with Josephine (who was known to Stephanie from many past visits with her mother), the child was referring to Josephine as "mommy" in her mother's presence and was telling her mother that she did not want to see her. This occurred during Jeanne's visit with her daughter at DCF offices. Mother was greatly disturbed by the child's remarks, argued with the child and left the room. The child's remarks would have been no surprise to Dr. Mantel as he noted in his report that the child was overly affectionate with people she barely knew. (State's Exhibit #9). Josephine J. was well-known to Stephanie. During Jeanne's visits with Stephanie on December 3, 1997 and December 17, 1997, the DCF worker who supervised the visits noted mother to appear glossy eyed, red-faced and angry leading to a suspicion that she was under the influence of drugs. On December 3rd the child had to call mother three times to get her attention while mother was constantly swearing. On December 17th Jeanne was asked to give a urine test and refused. (See State's Exhibit #2). After each of these visits, Stephanie was very upset with her mother and after the later visit told Josephine she didn't want to go anymore. On December 19th the child's therapist and Jewish Family Services reported to DCF that the child no longer wished to visit her mother and recommended cessation of the visits. The department. agreed with that recommendation, however, Jeanne was unfortunately not told of this until Christmas Eve when she arrived at DCF offices with gifts only to find that Stephanie would not be coming and the visits would cease!
On January 12, 1998, the court (Kocay, J.) terminated the parental rights of Jeanne P. as mother and those of the father of Stephanie's sister, Destiny. Stephanie was making good progress at school and was doing well at Josephine's residence. She was seeing a therapist at Waterbury Child Guidance. Thus, by early May, the petitioner was urging permanent residency with Josephine as the plan for Stephanie. Since Jeanne objected, a second evaluation by Dr. Mantel was ordered by the court. CT Page 6580
That evaluation was performed on May 29, 1998 and involved Stephanie, Jeanne and Josephine, the latter consenting to an interactional observation only. (See State's Exhibit #7.) Josephine did, however, complete a detailed questionnaire concerning appearances and behaviors upon the child's arrival at her residence some seven months previous compared to those more recently observed. To put it in a nutshell, Dr. Mantel observed that Jeanne's psychological status was unchanged since his last evaluation, while Stephanie appeared to have made substantial gains developmentally, had become more stabilized and was secure with Josephine J. Jeanne admitted to a then three year relationship with Henry S. and had given up on the goal of having Stephanie returned to her. Dr. Mantel testified that she exhibited a lack of order and settledness in her life that made her incapable of discharging appropriate child care. A warm, loving relationship was observed between Stephanie and Josephine J. and a powerful attachment to her new family was noted. Stephanie clearly did not want to see her mother and referred to her aunt and uncle as "mommy and daddy". Dr. Mantel concluded that the aunt and uncle were Stephanie's psychological parents and testified that, developmentally, the emotional bond that existed between Jeanne P. and her daughter had been permanently broken. He recommended permanent residence with Josephine and no further visitation with Jeanne as being in Stephanie's best interest.
On July 1, 1998, the court (Swienton, J.) extended the commitment to August 23, 1999 and found that further efforts to re-unify Stephanie with her mother were inappropriate, approving as a permanent plan for Stephanie; termination of parental rights and adoption. Connecticut General Statutes § 46b-129(k). On August 17th the instant petition was filed.
IV. ADJUDICATION
For the purpose of adjudication, the court's inquiry is limited to events which preceded the filing of the present petition. Connecticut Practice Book § 33-3. The adjudicatory date is, therefore, August 17, 1998. The disposition date is the date on which the trial concluded and decision was reserved, i.e., May 26, 1999.
A. AS TO MOTHER — JEANNE P.
In order to obtain the relief requested in the petition, CT Page 6581 petitioner must prove by clear and convincing evidence the statutory grounds which are alleged in the petition. Since there is no doubt that Stephanie P. was found in a prior proceeding in this court to have been a neglected child, (which the court so finds by clear and convincing evidence) the state must also prove that Jeanne P., the mother of said child, has failed to achieve such degree of personal rehabilitation as would encourage one to believe that, within a reasonable time, considering Stephanie's present age and her particular needs, mother could assume a responsible position in Stephanie's life.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive role as a parent." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). The statute "requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular-child and further, that such rehabilitation must be foreseeable with a reasonable time". (Internal quotation marks omitted.) In re Christina V., 38 Conn. App. 214, 220-21,660 A.2d 863 (1995). When considering the issue of personal rehabilitation, the court must consider whether the age and needs of the child support the allowance of additional time for the parent to rehabilitate. In re Luis C., 210 Conn. 157, 167-168,554 A.2d 722 (1989). At the adjudicatory phase of a termination trial the crucial issue which must be determined by the court is whether the parent was better able to resume his or her parental responsibilities at the time of the filing of the termination petition than at the time of the child's commitment. In reMichael M., 29 Conn. App. 112, 126, 614 A.2d 832 (1992). Also see In re Hector L., 53 Conn. App. 359, 367 (1999).
At the time of Stephanie's commitment on August 23, 1996, the child was five and one-half years of age and had been out of Jeanne's custody for nearly a year. N.O.W., Inc. was commissioned by DCF to manage an intensive reunification effort. Jeanne had, several months earlier, successfully completed the inpatient drug program and random drug testing was yielding negative results. All was going quite well until the discovery by the department that Henry S. was still in the picture, thus prompting a specific no contact order from the court and resulting in a temporary suspension of reunification efforts. At the time of commitment N.O.W., DCF and the court charted the path for Jeanne to follow to regain custody of her child. The mother needed to complete parenting classes, stay drug free, engage in follow-up drug CT Page 6582 counseling, enroll in the Susan B. Anthony program and refrain from any further association with Henry S. Several months after the commitment, Dr. Mantel also recommended reunification, but only after Jeanne had significantly revised her life style and strictly adhered to the court's expectations. By June, 1994, ten months after commitment, despite Jeanne's failure to enroll in the parenting classes and the Susan B. Anthony program, reunification was close to being achieved. The death knell for that goal was the positive hair analysis which confirmed that Jeanne was reusing cocaine. Confirmation two months later that Jeanne continued to involve herself with Henry S. was the anti-climax. One year after the commitment, Jeanne's life style, her behaviors, and her associations had not changed one iota.
The department had no choice but to consider another plan. Stephanie had been in three foster placements while efforts were made to reunite her with her mother. The child's great aunt, Josephine J., was thus certified as an appropriate placement. Stephanie has progressed well while with Josephine. She has developed a powerful attachment to and a warm and loving relationship with her new family. As observed by Dr. Mantel during his testimony:
 "This child had a fractured life — drugs, multiple male relationships with mother, domestic violence, had set her own house on fire — was at immense risk for no healthy attachment to any adult. Mother missed an important opportunity for the child to achieve some stability and permanency. The child found this not in her mother, but in her aunt and uncle."
After Stephanie was placed with Josephine, DCF continued its efforts to assist Jeanne in altering her behavior and life style. Jeanne, however, chose to refuse numerous requests for for further drug tests, failed to keep evaluation appointments with McCall's, did not attend one parenting class and moved her residence on several occasions without notifying the department. During his evaluation of May 29, 1998 (State's Exhibit #7), Dr. Mantel could no longer find any evidence of an ongoing relationship of mother and child and noted during his testimony the disappointment felt by Stephanie over her mother's lack of effort — a disappointment which ultimately "caused her to reject her mother and to forge a parental bond with her aunt and uncle.
At the time the present petition was filed, this court finds, CT Page 6583 by clear and convincing evidence, that Jeanne was no better able to resume her parental responsibilities than at the time of Stephanie's commitment two years prior thereto. Considering Stephanie's age, the fact that she has been in foster care for nearly four years and her need for and entitlement to a permanent home, this court finds by clear and convincing evidence that Jeanne P. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, she could assume a responsible position in the life of her daughter. The court also finds, by clear and convincing evidence, that DCF has made reasonable efforts to reunify Stephanie with her mother, but mother, despite some earlier successes, has for over two years, refused to cooperate with the department.
B. AS TO FATHER — SHANE P.
As noted earlier, Stephanie's father executed the appropriate statutorily mandated form consenting to a termination of his parental rights after which a full canvass was done by this court. Due to his incarceration no efforts toward reunification were made by DCF The court finds by clear and convincing evidence that Shane P's consent was voluntarily and knowingly given.
V. DISPOSITION
It should be noted that although DCF obtained a finding from the court (Swienton, J.) in July, 1998 that reunification efforts were no longer appropriate and although the department filed the present petition one month later, efforts by the present case worker did, in fact, continue. However, Jeanne P. requested no services and continued to boycott the administrative case reviews. The caseworker noted that in the nine visits she had with Stephanie up to the date of her testimony, the child made no inquiries as to her mother and made no mention of her name. Stephanie, the case worker noted, is happy and content and views Josephine J. as her parent and role model. The plan is for Josephine to adopt Stephanie.
Jeanne P., while agreeing that long term residence of Stephanie with Josephine is a better alternative than "bouncing the child from one foster home to another", nevertheless, opposes the termination and adoption plan and urges that a transfer of guardianship be considered as a plausible alternative. Dr. Mantel addressed this issue in his third evaluation of March 25, 1999. CT Page 6584 (State's Exhibit #8). Noting that Stephanie lacked any memory of living with her mother, did not wish to see her and was "strongly ambivalent" concerning any contact with her father, and expressing Stephanie's desire to be adopted by people who love her, the evaluator recommends complete severance of the parent-child relationship, there being, as to mother and child, no such relationship to preserve. At trial, Dr. Mantel was asked about the guardianship alternative. In general, he said that all children need a permanent home to have a "reasonable shot at psychological health"; adoption offers a stronger opportunity to achieve that end than guardianship. As to Stephanie, she has no connection whatsoever to her mother and father and did not wish to see them, noting that Stephanie is not "wishy-washy" and does not easily bend. In his opinion, after performing three evaluations of mother and child over a more than two year period, permanent placement via adoption by her aunt and uncle offers Stephanie the greatest chance for success. The psychological testimony from professionals is rightly accorded great weight in termination proceedings. In re Nicolina T., 9 Conn. App. 598,605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519
(1987); In re Pascacio R., 52 Conn. App. 106, 112 (1999).
The court finds, by clear and convincing evidence, that termination of the parental rights of Stephanie's parents is in her best interest so that she may be adopted by the foster mother who has demonstrated for nearly two years her ability to meet the educational, psychological and developmental needs that this child has and will continue to have well into the future. She has, through her efforts on behalf of this child achieved the role of psychological parent and deserves the role of her legal parent.
VI. MANDATORY FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(d)[6]:
(1) Timeliness, nature and extent of services offered:
Appropriate and timely services were provided by DCF including case management services, family preservation, supervisors for visitation, substance abuse services and programs dealing with relationship physical abuse. However, all efforts failed due to Jeanne's continued use of cocaine and refusal to permanently sever the relationship with Henry S. She has refused CT Page 6585 to cooperate with DCF and continues to remain a part of the anti-social sub-culture referred to by Dr. Mantel.
(2) Reasonable efforts to reunite:
Such efforts by DCF are mandated by the Federal Adoption Assistance and Child Welfare Act of 1980. 42 U.S.C. § 670 et. seq. The Department of Children and Families has provided and offered to provide to Jeanne P. a multitude of intensive community based services, however, mother has refused, particularly over the past two years, to accept such services. The mother has derailed all attempts at reunification and has been unable or unwilling to rehabilitate herself. The action of DCF to institute the termination proceedings is consistent with the federal law which is designed to eliminate foster care drift and to secure permanent placement for children in foster care.
(3) Fulfillment of court-ordered obligations:
The court (Dennis. J.) set reasonable and realistic specific steps (then called "expectations"). (State's Exhibit #1). Jeanne has failed to comply with court orders to remain substance free, verify her sobriety through random drug testing, cooperate with providers arranged for by DCF (McCall's, Susan B. Anthony) and have no contact with Henry S.
(4) Feelings and emotional ties of child to parents andJosephine J.:
As noted, Dr. Mantel has found no evidence of any relationship between Stephanie and her mother. Her foster parents are the child's psychological parents and she now has achieved a permanent bond with them in a loving and caring relationship which is of nearly two years in duration. Stephanie has no desire to see her mother and cannot recall residing with her mother.
(5) The age of the child:
Stephanie is now eight years old and five months of age. She has been in foster care since she was four years and eight months of age. Foster care should be a strictly time-limited interval in the life of any child. The federal act referred to herein envisions a permanent home for a child after only twelve months of foster care. Stephanie has been in foster care for nearly four years and, prior to residing with Josephine, was in foster care CT Page 6586 for over two years. She is entitled to a permanent home without further delay. She has suffered the psychological effects of the court proceedings for far too long; time is of the essence. In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992).
 (6) Efforts of Jeanne to adjust her circumstances, conduct or conditions:
As previously stated, shortly after the order of temporary custody was entered, Jeanne completed an in patient substance abuse program. At the time of Stephanie's commitment to DCF a year later, intensive services were in place to achieve reunification, only to be postponed due to mother's involvement with Henry S. One year after that commitment, reunification being only a month or two away, Jeanne was found to be reusing cocaine with the resultant derailment of reunification efforts. Since that time, i.e., June, 1997, Jeanne has refused all department services and has failed to take any steps to adjust her circumstances, conduct or conditions to make it in Stephanie's best interest to return to her mother. Since visitation was suspended in December, 1997, mother has not maintained any communication regarding her child and has made no attempt to contact DCF or Stephanie's therapist to inquire as to the well-being of her child. Mother's relationship with Josephine is non-existent.
(7) Prevention of meaningful relationship by others:
The department provided extensive visitation privileges to Jeanne from Stephanie's initial placement in September, 1995 until June, 1997 when the reuse of cocaine by mother was confirmed. At that time, visitation was three to five times during the week and included some weekends. The supervised visitations that followed became increasingly disruptive to the child. Mother would argue with the child, ignored her on occasion and presented with symptoms of drug abuse. This resulted in severe acting out and Stephanie's ultimate refusal to continue her visits with her mother. DCF supported efforts to provide significant visitation to Jeanne until, in the opinion of the child's therapist and the department it became detrimental to the child's well-being. Since the suspension of visitation privileges, Jeanne has failed to cooperate with DCF, refused random drug testing, declined substance abuse evaluation and further treatment and has utterly refused to alter her life style. The only person who has acted unreasonably vis-a-vis any CT Page 6587 meaningful relationship with Stephanie is her mother.
Although it is not a statutorily mandated finding this court is well aware of the strong policy in this state and across the country requiring parents to financially support their children. In re Bruce R., 234 Conn. 194, 209 (1995). Father has referred to Stephanie as his "pride and joy" yet has never provided any financial support for her. (State's Exhibit #6, page 12). There has been no showing that mother provided any financial support for her daughter in the nearly four years that Stephanie has been out of her care. The termination of the parental rights of both parents will free Stephanie for adoption by persons who have been providing and will continue to provide for all of her needs.
VI. ORDERS
Based on the findings that have been made by clear and convincing evidence and considering the seven statutory factors, it is:
ORDERED that the parental rights of Shane P., his consent having been accepted by this court on May 24, 1999, and of Jeanne P., because of her failure to achieve that degree of rehabilitation referred to in § 17a-112 (c), CGS, be and are hereby terminated.
ORDERED that the commissioner of the Department of Children and Families is hereby appointed statutory parent for the purpose of placing Stephanie in adoption.
ORDERED that said commissioner shall submit to this court within ninety days of the date of this memorandum a written report as to the progress toward such adoption.
ORDERED that if such adoption is not finalized within one year from the date of this memorandum, said commissioner shall submit a motion for review of terminated child no later than July 17, 2000, to be docketed and heard no later than one year following submission of the ninety day report.[7]
Wilson J. Trombley, Judge