MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Commissioner of Department of Children and Families ("DCF").
The respondents, Gwendolyn K. and Jeremy J., are the biological parents of Justin.
 PROCEDURAL BACKGROUND
On November 13, 1995, a petition alleging Justin was neglected and uncared for was filed by DCF. An order of temporary custody was granted by the court on the same day.
On January 26, 1996, the court found that Justin was uncared for and committed him to the care and custody of DCF.
The original petition alleged that the child was neglected in that he had been permitted to live under conditions injurious to his well being and that he was uncared for in that the home could not provide the specialized care which the child's physical, emotional, or mental conditions required. On January 26, 1996, the petition was orally amended to add an allegation of homelessness.
Three extensions of commitment were granted. The current commitment is due to expire on January 26, 2000.
On September 30, 1998, DCF filed a petition for termination of parental rights of Gwendolyn K. and Jeremy J. With regard to Gwendolyn, the petition originally alleged incorrectly that the child is neglected or uncared for and has been in the custody of the Commissioner for at least 15 months, and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. Conn. Gen. Stat. § 17a-112
(c)(3)(B)(2) On the first day of trial, the petitioner was allowed to amend the petition to reflect the proper legal grounds that the child had been found in a prior proceeding to have been neglected or uncared for and the mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. Conn. Gen Stat. § 17a-112 (c)(3)(B)(1).
With regard to Jeremy J., petitioner alleged that he had abandoned the child in the sense that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(A). The petition also alleged there was no ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis, the physical, emotional, moral or educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(D). Finally, with respect to Jeremy, the petition alleged failure to rehabilitate as would encourage the belief that within a reasonable time, considering the age and need of the child, he could assume a reasonable position in the life of the child. On December 2, 1998, Jeremy J. consented to the termination of his parental rights.
The court finds that there is no proceeding pending in any other court affecting the custody of this child.
FACTUAL FINDINGS
The court heard testimony over two days and received into evidence a social study and addendum to such study, a service agreement, reports regarding Gwendolyn's performance in various programs and discharge summaries from such programs, correspondence from the Department to Gwendolyn, a psychological report dated March 8, 1999, a summary of visitation, a list of CT Page 15566 services offered to Gwendolyn and a letter from Gwendolyn's present employer.
The court makes the following findings by clear and convincing evidence. Gwendolyn gave birth to Justin when she was only 13 years old. The child was the product of a rape by her sister's boyfriend, Jeremy J.
Gwendolyn was in DCF placement herself at the time of the child's birth. Initially, she was placed in St. Agnes Home where she and the child could be together. She was discharged approximately nine months later for violating the rules. The Department was then able to find one foster home which would take the mother and child together. However, this placement disrupted after only nine days. At that point, the Department could not find another placement where the mother and child could be placed together. The Department then sought an order of temporary custody regarding the child and placed Gwendolyn and Justin in two different foster homes. Gwendolyn was subsequently moved from the foster home to the YMCA youth shelter. Ultimately, Gwendolyn ended up in a residential facility, New Hope Manner, where she remained until June of 1997. She received intensive services in this placement including counseling and parenting classes. During this time period, mother had been visiting with Justin once per week.
Because Gwendolyn's therapists were pleased with her progress in the New Hope Manner program, Gwendolyn was offered the opportunity to participate in the Sail program. This program afforded her the opportunity to learn independent living skills in a less restrictive environment as well as to work towards reunification with her son. The Sail program provided housing, counseling and an independent living skills course. It required school attendance and after school employment. Gwendolyn lasted in this program for less than six months. Given her age and lack of motivation, she was not able to meet the basic requirements of the program. She had difficulty getting to school on time and attending regularly. She eventually quit school on January 6, 1997. She also had four different jobs during the short time she was in the Sail program.
During the time period that she was in this program, Gwendolyn continued to visit regularly with Justin. On one occasion, she informed staff that she had become frustrated and that she hit Justin because she could not stop him from having a CT Page 15567 tantrum. There were no marks on the child and it is unclear how hard she hit him. DCF's response to this admission by Gwendolyn was to slow, if not internally bring to an end, the reunification process by requiring supervised visitation and reducing the amount of visitation that was to take place.[2]
After being discharged from the Sail program, Gwendolyn decided to try and make it on her own. She refused any further placements by DCF and refused any further services offered by DCF. DCF filed for a revocation of Gwendolyn's commitment. On December 12, 1997, this petition was denied. Gwendolyn subsequently filed for Emancipation and this petition was granted on July 8, 1998.
Initially Gwendolyn had unstable living arrangements. After having her own apartment for several months, she went to live with some friends for whom she did babysitting in exchange for room and board. This arrangement lasted for approximately six months. Gwendolyn then found a new apartment. After deciding that this apartment was too expensive, she moved to another apartment. She subsequently moved in May of this year to a new apartment where she lives by herself.
In the summer of 1998, DCF referred Gwendolyn to Wheeler Clinic for counseling. She did not follow through on this referral but on her own sporadically attended counseling between January and April of 1999 at a different facility.
Since January of 1999 Gwendolyn has been employed by a telemarketing company. This company provided a letter saying she has a good attendance record, works to the best of her ability and is considered to be a valuable employee. She attended a parenting program between January and June of this year. She sought out this service on her own and attended it voluntarily.
Justin is a special needs child. He is diagnosed with ADHD and may have an attachment disorder. He is extremely active and is described as a hand-full by all who know him. Since April he has been receiving Ritalin, and this medication seems to help significantly with his behavior.
ADJUDICATION
A. Reunification
CT Page 15568
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that this parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, if a court has determined at a hearing pursuant to subsection (b) of § 17a-110 that such efforts are not appropriate. On January 25, 1999, at a hearing, the court made the requisite finding that further efforts to reunify the parent with her child were not appropriate.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat.
§ 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). Because the petition was amended on the first day of trial, the relevant date is November 4, 1999.
TERMINATION ADJUDICATION
A termination petition which can result in severing family ties implicates various constitution concerns. The United States Supreme Court held in Santosky v. Kramer, 455 U.S. 745, 753
(1982) that "the fundamental liberty interests of natural parents in the care, custody and management of their children does not evaporate simply because they have not been model parents where they have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing an irretrievable destruction of their family life." However, a parent's constitutional rights do not exist in a vacuum without reference to the rights of the others in the family, community and in the larger society in which the individual functions, and in particular, they do not override a child's right to be safe and to grow and to be nurtured in a supporting environment. As set forth in Conn. Gen.Stat. § 17a-101 (a): "The public policy of this state is to protect children whose health and safety may be adversely affected through injury and neglect." CT Page 15569
FAILURE TO REHABILITATE
"A statutory ground for termination arises when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of person rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C.,210 Conn. 157, 167 (1989).
No dispute exists that the court has previously found Justin to have been uncared for, thus satisfying a statutory prerequisite. The rest of the statute requires the court to find whether the facts "encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child."Conn. Gen. Stat. § 17a-112(c)(3)(B). The primary issue for adjudication before this court then is whether Gwendolyn is better able to assume the responsibilities of parenting at the time of the amendment of the termination petition than she had been at the time of the child's commitment on January 26, 1996.In re Michael M., 29 Conn. App. 112, 126 (1992); In re Hector L.,53 Conn. App. 359, 367 (1999). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In reJessica M., 49 Conn. App. 229, 240 (1998). The court finds that the State has not proven by clear and convincing evidence that Gwendolyn has failed to rehabilitate within the meaning of Conn. Gen. Stat. § 17a-112 (c)(3)(B).
Gwendolyn has made significant progress over the last year in her personal rehabilitation. She has been able to keep a job for almost a year and has lived on her own in an apartment. She also attended a parenting class and received some counseling. This young woman has continued to visit with Justin and maintain a strong interest in his welfare. After being placed on medication, Justin's behavior has also improved dramatically. All of this progress encourage the belief that within a reasonable time, considering the age and needs of the child, Gwendolyn could assume a responsible position in the life of this child. CT Page 15570
ORDERS
The court orders that the termination of parental rights petition is hereby dismissed. This court will retain jurisdiction over this matter. Counsel for the child and the Department of Children and Families are directed to file an extension of commitment.
Dr. Mantell recommends in his evaluation that a permanent placement be found for Justin, either with a suitable family, if DCF can find one, or with his biological mother. While he found that mother and child interacted nicely, he also expressed strong concerns about mother's ability to parent Justin on a full time basis given the problems with his behavior and her past history. At the time of his evaluation, Justin had remained in a non-adoptive foster home for four years and had not started on the medication which has significantly helped him. In July of this year, Justin was moved to a pre-adoptive home. The foster mother testified that she is not willing to commit to adopting Justin. No other pre-adoptive home has been identified.
DCF is ordered to attempt to achieve reunification of Gwendolyn and Justin over the next six months. It is strongly suggested that a new DCF worker be assigned to work to achieve this reunification. It was abundantly clear throughout the trial that there is significant tension between the current worker assigned to this case and Gwendolyn. The court does not believe that they can work together in a productive manner.
The court enters the following steps with regard to Gwendolyn:
1. Keep all appointments with DCF. Cooperate with DCF home visits, announced or unannounced, and visits by the child's court appointed attorney and/or guardian ad litem.
2. Keep your whereabouts known to DCF, your attorney and the attorney for the child.
3. Participate in parenting counseling and family counseling that specifically addresses parenting a child diagnosed with ADHD, and attachment disorder.
4. Accept and cooperate with in home support services CT Page 15571 referred by DCF and make progress towards the identified goals.
5. Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress towards identified goals, and for use in future proceedings before this Court.
6. Maintain adequate housing and legal income.
7. No substance abuse.
8. No involvement with the criminal justice system.
9. Consisting and timely meet and address the child's physical, educational, medical, or emotional needs, including, but not limited to, keeping the child's appointments with his medical, psychological, psychiatric, or educational providers. This order includes, but is not limited to, meeting with the child's current pediatrician and any other evaluators to assist mother in understanding her child's diagnosis and any professional's recommendations for therapy and medication.
10. Make all necessary childcare arrangements insuring that the child is adequately supervised and cared for by appropriate caretakers.
11. Immediately advise DCF of any change in the composition of the household to insure that the change does not compromise the health and safety of the child.
12. Maintain the child within the State of Connecticut during the duration of this order.
The court believes it is important to emphasize the importance of compliance with these steps. Failure by Gwendolyn to fully comply and actively work with DCF to achieve the goals set may result in no reunification with Justin and the filing of a new Termination Petition.
DCF is ordered to:
1. Take all necessary measures to ensure the child's safety and well being. CT Page 15572
2. Provide case management services.
3. Develop periodic treatment/permanency plan and review it with mother.
4. Refer the mother to appropriate services (see above) and the child to appropriate services (see above) and monitor her progress and compliance.
5. Monitor the welfare of the child and the circumstances surrounding his care by mother.
6. DCF should assist mother in finding an appropriate preschool program and/or any therapy for the child which is recommended by his pediatrician and/or professional evaluators.
7. Attempt to achieve reunification over the next six months.
An in-court review is in place before this court on March 21, 2000 at 9:30 a.m.
CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT