[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Alexis, born June 5, 1997, entered foster care on June 6, 1997 under an Order of Temporary Custody filed by the Department of Children and Families ("DCF"). The Neglect Petition alleged that the child was denied proper care and attention and was permitted to live under conditions, circumstances or association injurious to well-being. Based on a nolo contendere plea made by the mother, Jacqueline (born 5/23/80), Alexis was committed to DCF on September 18, 1997. The commitment has been extended to September 18, 2000. On September 3, 1998 the court found continuing efforts at reunification were not appropriate.
A Petition to Terminate Parental Rights was filed on December 11, 1998, the adjudication date. The last hearing occurred on September 23, 1999, the disposition date.
The statutory reasonable efforts at reunification finding is not required as the court determined at a September 3, 1998 hearing that such efforts were not appropriate.
The father, Eric H., served by publication, did not appear for any court hearing in connection with this petition which alleges that the child has been abandoned by the father §17a-112(c)(3)(A) who has no parent-child relationship with him, and to allow further time for the relationship would be detrimental to the best interest of the child Conn. Gen. Stat. § 17a-112(c)(3)(D).
The child having been in DCF custody for fifteen months, the petition alleges that the mother Jacqueline J. (born May 23, 1980) having been given specific steps for reunification has failed to rehabilitate herself and there is no belief she can do so within a reasonable time. § 17a-112(c)(3)(B). CT Page 16762
The mother also filed a motion to transfer guardianship of child to the maternal grandmother: the court accepted the motion as an attempt to modify the neglect disposition. Practice Book §33-11. This motion created a co-terminus situation, although the neglect adjudication had previously been established. § 17a-112(e). The court therefore, must determine by clear and convincing evidence whether statutory grounds exist to terminate parental rights and whether termination is in the best interest of the child. If DCF fails to prove either ground, the court would then consider the dispositional motion by a fair preponderance of the evidence. Practice Book § 33-12. The trial was not trifurcated, but each stage involves different issues. In re Denzel A.,53 Conn. App. 827 (1999).
The DCF Social Study was introduced into evidence. Exhibit S-8.
The mother and the child were each represented by court appointed counsel. Although the mother appeared for the termination hearing, she did not testify. The grandmother testified on the motion. The mother opposed the termination petition, and favored the motion while the Attorney for the child supported termination.
The court grants the petition to terminate parental rights. The motion to modify the neglect disposition is denied on the merits and as moot.
 Ia.
The neglect petition dated June 25, 1997 listed Eric H. as the father of Alexis. To resolve any question of paternity, genetic testing was done in June 1999, which confirmed that Eric H. was the father of Alexis and the court so found. Exhibit S-6. The father has never seen his child, nor has he paid support or sent cards or gifts. The twenty-seven month old child has no parent-child relationship with Eric H. DCF contacted the father and would have provided services upon request without obstacle. On the contrary, he showed no interest, concern, or responsibility as to the welfare of his daughter.
 Ib.
Although Alexis went directly on June 6, 1997 from the birth CT Page 16763 hospital to foster care, on June 13, 1997 she was placed with a relative foster parent who on June 20, 1997 requested removal. Alexis lived with a great aunt for a week. Except for these short periods with relatives and two days at St. Agnes Center with her mother, she has lived with the same current foster family.
The mother executed Services Agreement with DCF in April and June, 1998. Exhibit S-7, S-8. She received Court Expectation on September 18, 1997. (S-5); she failed to comply with counseling, no substance abuse, cooperation with St. Agnes and had two larceny charges and was re-arrested for violation of probation.
In February, 1999, the mother gave birth to a son for whom she is caring, unlike her relationship with her daughter; the mother, son and the father reside together.
Alexis was evaluated by Birth to Three which recommended special services for the girl who lacks communication skills. The child screams and kicks, bangs her head on the floor, and picks her skull until it bleeds. Alexis is destructive and could hurt an infant. Recommended programs have been instituted; genetic and neurological testing are in progress.
The child needs one-to-one caretaker with attention to her needs. DCF rejects the mother or grandmother as that caretaker. The grandmother's history and living circumstances are not persuasive in her favor. The grandmother has not been connected in assisting her daughter to obtain services. There would not be a one/one situation if Alexis was placed with her grandmother. There are now five children in the home, with Alexis in the home it would be chaotic resembling the environment in which the mother was raised.
DCF unsuccessfully provided reasonable services for the mother, including pre-natal at Connecticut Health Service, and Women/children Center. DCF through Middlesex Hospital provided a parent aide in September 1997. Initially the young mother made slow but meaningful progress. In June 1997, the mother began counseling at Elmcrest. A drug evaluation and treatment program, Positive Steps, reported in October 1997, that she missed appointments and refused testing. These community services were interrupted for a trial reunification at St. Agnes Family Center on December 17, 1997. Two days later, the mother left "because she didn't want to take care of her baby." St. Agnes recommended in December 1997 against any further reunification attempts and CT Page 16764 suggested a permanency plan for Alexis. (Exhibit S-1). In December 1997 Jacqueline signed a statement refusing all services. Parent aide services without the baby were resumed, but the mother had little knowledge of child development and appeared not to have a constant commitment to her daughter. (Exhibit S-2). She was discharged because of dirty urine. The mothers persistent use of marijuana without rehabilitation services was an impediment to visitation and reunification.
In February 1998, DCF made a Community Based Life Sills Program referral but the mother did not follow through. In the spring of 1998, DCF began to move toward reunification because of the cooperation of the mother. In 1998 for about two months, she participated in anger management counseling. The mother began working in the Spring of 1998 with Child and Family Agency, but continued marijuana use utilizing a pill that cleared her urine prior to drug screens. In July 1998, she was referred to two agencies for substance treatment, but rejected them for too many rules; she still used drugs.
If termination were granted DCF would look for a special
pre-adoption home. DCF acknowledges a bond between Alexis and her grandmother so DCF would also continue to look to her as a visiting resource. Termination does not necessarily block the grandmother from any role in the life of her granddaughter in the future.
While living with her mother, Jacqueline had an unstable life. She repeated first grade three times. In mid 1991 after a diagnosis of major depressive disorder, residential treatment was recommended. In January 1992, she was committed to DCF and placed at Devereaux Glenhome; however, in June 1993 she was removed by her mother against clinical advice. In November 1994, her mother refused to have Jacqueline returned to her home. After a stay at Long Lane, Jacqueline was involved in a fight with her in 1997, just before given birth to Alexis. Considering the history of the relationship between grandmother and mother, the court is not reassured by the grandmother observation that she sees some of Jacqueline problems in Alexis. The grandmother attended Briarwood for two years and holds an associate degree as a medical CT Page 16765 secretary/assistant. She has been employed in that capacity. She denies she suffers from Lupus, but does take medication to relieve symptoms. While the grandmother has no special training to care for a child like Alexis, she is willing to accept immediate guardianship. She would be willing to undergo training. Currently unemployed, she plans to return to work so would place Alexis in a day care. Despite the caution about exposing Alexis to young children, the grandmother proposes that Alexis and an almost two year old daughter of her fianceacute would sleep in the same bed. While the grandmother has achieved personal goals, the court is not convinced the grandmother has the ability to appropriately care for the specialized needs of Alexis. She seems to lack insight into her own issues and minimizes issues looking to simplistic solutions. Although counseling was recommended in April, 1999, she did not start until just prior to trial in September; she does not think she needed counseling. While engaged to be married, she is postponing the wedding until this care is concluded. She has time now but no special training. Of the grandmother's four [siblings] CHILDREN, two live with their father, Jacqueline has been in Long Lane and the fourth has three illegitimate children. Certainly the grandmother wants to maintain a relationship with Alexis, even if adopted, and termination, if granted, would not preclude that connection.
On August 4, 1997, the seventeen year old mother and child were evaluated by psychologist Dr. Barbara P. Berkowitz in connection with the neglect plea. The mother was defiant, volatile, angry and resistant. Dr. Berkowitz, whose expertise was stipulated, concluded that the mother would be uncooperative with reunification plans. Dr. Berkowitz was pessimistic about the then forthcoming St. Agnes placement. The psychologist advised that if the mother failed to make a commitment for regular individual therapy, than the mother was not committed to effective parenthood. Further. Dr. Berkowitz suggested that under no circumstance would reunification of grandmother, mother and child be considered suitable. Exhibit S-4A.
Dr. Berkowitz did a more expanded evaluation on April 16, 1999 in connection with the termination petition. Included was maternal grandmother as well as the mother and foster mother. Dr. Berkowitz reported that the mother accomplished very little of the prior suggestions. The mother was not a resource. Given her background and present situation, the grandmother was not then a resource, but might over time become suitable as a guardian excluding Jacqueline from child care. Dr. Berkowitz suggested certain recommended services and a family reassessment in nine months.
On July 27, 1999, a development evaluation of Alex was conducted by Dr. Kaplan, M.D. "The combination of developmental CT Page 16766 delay and severe behavioral dysregulation places her at extreme risk of future permanent cognitive impairment and the development of significant disruptive behavior disorders." Social-emotional intervention would be difficult. Alexis is a very challenging child requiring intensive early intervention services, including behavioral intervention. She has persistent, severe global development delays as well as significant motor delay. Exhibit S-3.
Dr. Berkowitz testified at trial Alexis needs a structured, stable home in which she is the only child. She needs sophisticated parents to negotiate for and cooperate with services; the home must be therapeutic with behavioral skills. Dr. Berkowitz cautiously did not recommend the child reside with the grandmother, even without knowing whether the grandmother engaged in services from April 1999. In fact, the grandmother started counseling at Catholic Family Services on September 20, 1999, she doesn't think she needs counseling.
There was some improvement in the mother between evaluations. Dr. Berkowitz recommended anger management for the mother. But even with available services, the mother could not appropriately care for her special needs child because the mother resents people telling her what to do. The mother herself suggested guardianship with the grandmother until the mother was in a position to raise her child.
The testimony of professionals is given great weight. In reMichael M., 29 Conn. App. 112 (1992).
If the grandmother became the holding home for the mother, she would have open access to the child but the mother is not bonded with her daughter. Mother and daughter have visitation at the grandmother's home; the mother is distracted or tends to her son.
Because of Alexis relationship with her foster mother and day care worker, any shift for Alexis would be a set back. If termination was granted DCF would look for a special pre-adoption home, even though the child has bonded with her present foster family. That licensed home concedes it can not meet the needs of this child. Because the present foster parents do not posses the skills necessary for Alexis, they are anxious that Alexis be moved to a permanent home. While adoption is not a necessary condition for termination, DCF presently has a suitable CT Page 16767 therapeutic foster home available for adoption within six to eight weeks.
 II.a
The father not having any contact with his daughter, the court finds by clear and convincing evidence as of the petition date that the child has been abandoned by the father in the sense that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. §17a-112(c)(3)(A), and there is no ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a continuing, day to day basis the physical, emotional, moral or educational needs of the child and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interests of the child. § 17a-112(c)(3)(D).
 II.b
The court finds by clear and convincing evidence as of the petition date that the child is neglected and has been in the custody of the Commissioner for at least fifteen months and the mother has been provided specific steps to take to facilitate the return of the child and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. § 17a-112(c)(3)(B). In re Hector L.,53 Conn. App. 359, 366-367 (1999); In re Shyleish H., 56 Conn. app. 167, 173 (1999).
 III.
In determining whether to terminate, the court must consider and make seven written findings. § 17a-112(s). The court did consider all relevant facts and family history. In re Breanina,50 Conn. App. 805, 814 (1998).
In addition to the findings already included, the court further finds these additional facts by clear and convincing evidence:
1. The services offered provided and made available to the mother were timely extensive and appropriate. If the mother complied, CT Page 16768 reunification would have been facilitated. A petition to terminate might have been filed sooner to hasten a permanency plan. No services were offered to disinterested father.
2. All the services provided by DCF were reasonable to unite child and mother.
3. Expectations and Specific Steps were set by the court with minimal compliance by mother, as previously described. Nothing set for father.
7. The parents have not been prevented from maintaining a meaningful relationship with their daughter by any unreasonable act or conduct of a parent or any other person or economic circumstances.
 IV.
A permanency plan is overdue for this troubled child. Alexis does not have the luxury of time. She has been in foster care for all except about two weeks of her young life. She is two and a half years old. She now needs loving individual skilled attention. Sadly, despite access to community services, the mother can not support that care. A residence shift must be made, hopefully into a dedicated adoptive family. Termination of parental rights is in the best interest of Alexis.
Accordingly, the parental rights of the parents are terminated. The commission of DCF is appointed statutory parent. DCF shall report to the court within sixty day's of judgment date on a case plan. A hearing for review of the plan shall be held within twelve months from the judgment date. Treatment plans/administrative reviews shall be filed in current sequence.
 V.
As the court has terminated paternal rights, the motion to modify the commitment is moot and denied. Even if it were not, the court would deny the motion for physical custody by the grandmother.
SAMUEL S. GOLDSTEIN JUDGE TRIAL REFEREE CT Page 16769